[Civ. No. 7220.   Third Dist.   July 12, 1946.]

ALICE L. FOERSTER, Respondent, v. JOAQUIN DIREITO et al., Defendants; PETE BORDENAVE et al., Appellants.

Neumiller, Ditz, Beardslee & Sheppard and C. H. Hogan for Appellants.

Phillip Barnett and Robert L. Dreyfus for Respondent.

THOMPSON, J.—The defendants, Pete Bordenave and Garrett W. Beckley, as individuals, and as members of the firm of Bordenave & Beckley, and Homer Bennie McDowell,

have appealed from a judgment which was rendered pursuant to the verdict of a jury against them in a suit for damages for the death of George Russell Foerster, the son of plaintiff, which occurred as the result of being struck by a truck driven by McDowell on the wrong side of Center Street in the city of Stockton. The deceased, in company with an associate, was standing, under the glare of a street light, on the walk which crossed the highway in Stockton. They were waiting to secure a ride in some passing automobile to Camp Parks near Livermore, where, as United States naval seamen, they were then stationed. The truck approached from behind them, on the wrong side of the street, and struck and killed the deceased. The appellants do not contend that the evidence fails to support the implied finding that the driver of the truck was guilty of negligence, but they seek a reversal of the judgment on two grounds only, namely, that the evidence shows as a matter of law that the deceased was guilty of contributory negligence, and that plaintiff's attorney was guilty of prejudicial misconduct in stating to the court in the presence of the jury that another son of plaintiff, who was a member of the Royal Canadian Air Force, had been recently killed in military service in the war. It is asserted that statement induced the jury to render an excessive verdict on account of sympathy or prejudice. The verdict was for $20,000. On motion for new trial the trial judge reduced the judgment to the sum of $15,000, which was accepted by the plaintiff, and the motion was thereupon denied.

The plaintiff, who was fifty-eight years of age, is the mother of the deceased, George Foerster, who was seventeen years of age, and of another son and a married daughter. The plaintiff was unmarried at the time of the accident. She was separated from her husband and had been employed as a saleswoman at Penney's Store, and in the Emporium and Weinstein's Store at San Francisco. She has not been employed since the time of the accident. She was ill and under the charge of a physician. Prior to his enlistment in the Navy, the deceased worked in San Francisco as a valet in the Palace Hotel, and was employed elsewhere, contributing to his mother's support from $37 to $75 per month. After the older son married, George contributed to his mother the sum of $75 per month.

El Dorado Street enters Stockton from the south and extends through the city in a northerly direction. Center

Street joins El Dorado at Fourth Street and runs north-westerly therefrom at a sharp angle. Both El Dorado and Center Streets are marked along the centers thereof by white lines which converge from a point slightly south of Fourth Street, which intersects those streets at a right angle. This juncture of El Dorado and Center Streets forms a gore or "Y" just north of Fourth Street. The combined streets are about 90 feet wide at Fourth Street. Center Street is 60 feet in width. A pedestrian's walk is outlined with white stripes across El Dorado and Center Streets along the extended southern line of Fourth Street. At the curb, on the north-west corner of Center and Fourth Streets, there is an electric pole equipped with an arc-light. In the center of Fourth Street, at a point about 16 feet north of the extended westerly curb line of Center Street there is a manhole. This manhole is about 27 feet west of the white stripe marking the middle line of Center Street.

At one o'clock a. m. of July 3, 1944, William L. Stone, who was enlisted in the United States Navy, and stationed at Camp Parks near Livermore, desiring to return to his camp from Stockton, walked to the southwest corner of Center and Fourth Streets in Stockton to hail a southbound automobile to procure a ride back to his camp. It was a clear night and the streets were well lighted. As he stood under the arc-light at that corner he was joined by the deceased, George Foerster, who also sought to obtain a ride back to his station at Camp Parks. These boys were not previously acquainted, but they agreed to attempt to procure a ride together in a passing machine. They walked easterly together from the curb along the pedestrian pathway a distance of about 16 feet where they stood 20 feet south of the manhole, facing the north from which they anticipated the approach of a car. They stood at that point, under the glare of the arc-light, 20 feet west of the middle white line of Center Street. They had no occasion to anticipate the approach of a machine from the south, be-hind their backs on the wrong side of Center Street, for to so travel would be in violation of the traffic law. There was then no machine in sight upon either El Dorado or Center Street. Suddenly, as they stood at that point, Mr. Stone's attention was called to the noise of the motor of an approach-ing machine behind them, coming from the south. Glancing over his shoulder, Mr. Stone saw a truck about 200 feet away coming directly toward them on the wrong side of Center

Street. He said it was traveling about 35 miles an hour. He testified that "I know he [the truck driver] was way over on that [western] side of the road. I could see the whole road so he had to be over on that side of the line." No horn was sounded. The speed of the truck was not diminished until immediately before it struck the deceased. There is no evidence that the deceased heard or saw the approaching truck. Stone however did say "Look out, there is a truck or something coming." There is no evidence that George Foerster heard that warning or that he knew the truck was coming toward them from their rear on the wrong side of the highway. Stone ran easterly along the pedestrian walk a distance of about 12 or 15 feet to avoid being struck. When he was asked on cross-examination why he ran toward the center of the street, he replied: "I thought the driver was asleep and I didn't know where he might wind up. He might have run up on to the curb and into the store or something. Anyway, I though my safest place was to run out in the middle of the road because I didn't know whether the driver was drunk or asleep or what happened to him, but I knew he was heading out in the wrong direction and I wanted to get out of the way of him."

Mr. Stone testified that the truck continued to run at the same rate of speed without changing its course until it struck the deceased. He said he saw the truck when it was "two or three feet" from the deceased; that it was running in a northwest direction toward the western curb. Stone testified that the deceased ran northwesterly about 16 feet, to a point 25 feet from where he previously stood. The truck driver pointed out on the diagram in evidence the spot where Foerster was struck, which was "three feet and two inches" northwesterly from the manhole which was designated thereon. That point is about 30 feet west of the white line marking the middle of Center Street. The truck was way over on the wrong side of Center Street and headed in a diagonal course toward the western curb. The evidence of Mr. Stone, that the speed of the truck was not diminished until it was close to the deceased, is corroborated by the evidence of skid-marks from the wheels of the truck which were clearly discernible on the paved street, beginning at a distance "seven feet and eleven inches back from the point of impact." The skid-marks extended to a point near the rear end of the truck as it afterward stood parked within 3 feet of the west-

ern curb on the wrong side of Center Street. It ran about 125 feet beyond the point where the boys stood on the pedestrian walk before it stopped. There were no other machines in sight on Center Street at the time of the accident.

Mr. Stone testified that after he ran several feet into the street, to escape being hit by the truck, he glanced back and saw Foerster still standing where he had left him and that the truck was then close upon him, but that the deceased then started to run in a northwesterly direction and was overtaken and struck at a point about 8 feet from the manhole. Stone heard the application of the brakes and saw the body of Foerster hurled into the air. He said "I know it must have been the truck running over the boy; it was bump! bump! bump!, all amid the noise that the truck makes, all together." The head and body of the deceased were badly crushed. He lay upon the street near the western curb of Center Street, a short distance behind the parked truck. He was then dead. The driver returned to the point where the body lay. An officer was promptly called, and they discussed the accident.

McDowell testified that he lived on North Center Street in Stockton; that he was employed by the defendants, Bordenave & Beckley, as a driver of their truck; that he was then returning after the delivery of a truck and trailer load of cattle to Vallejo and San Francisco. He was on his way home in Stockton, and had turned left from El Dorado Street onto Center Street when the accident occurred. He testified that he "saw a sailor [Stone] running to the right of the road just north of the pedestrian lane"; that he "just saw one" man at that time; that he didn't see Foerster until the truck was "twelve feet south of the cross walk. . . . When I first saw him he had his back turned to me. I had already cut to the left and when I saw him I cut still sharper to the left, figuring he would follow his first companion. . . . As I approached this cross walk I was cutting over toward the curb and as I said, when I got about the—— the front of my truck must have been somewhere about the cross walk, and he broke and ran the same way I was going. In other words, he ran northwest trying to get to the curb across the street, which I was headed for [in] the same direction." Evidently the deceased did not know of his danger from the truck coming from behind him on the wrong side of the street until the front of the truck was "somewhere about the cross walk" upon which he stood, for the driver testified

that he was then standing with "his back toward me." Mr. Stone testified that the horn was not sounded. Clearly the deceased was taken by surprise. In his emergency, not knowing which way the truck might go, the deceased ran northwest toward the nearest curb to escape being hit. He was overtaken and struck before he ran a distance of 25 feet. It is not reasonable to assume that Foerster would have stood with his back toward the approaching truck if he had known that it was coming toward him on the wrong side of the highway.

The jury was fully and fairly instructed on every essential issue. The appellants do not complain of any instruction given or refused. The jury returned a verdict of $20,000 in favor of the plaintiff. Upon motion for a new trial the judge reduced the amount of the verdict to $15,000. The granting of a new trial was made conditional upon the acceptance of that reduced judgment. It was accepted by the plaintiff and the motion was thereupon denied. From the judgment which was accordingly rendered this appeal was perfected.

The implied finding of the jury that defendants were guilty of negligence, which proximately caused the death of George Foerster, is amply supported by the evidence. Indeed, the appellants do not challenge that fact.

There is no merit in appellants' contention that the deceased was guilty of contributory negligence as a matter of law. He was standing in the light of an arc-lamp, on the pedestrian walk 27 feet west of the middle white line of Center Street, facing the north, with his back toward the approaching truck. There is no evidence that he saw or knew of the approach of the truck behind his back on the wrong side of the street. He was not required, in the exercise of due caution, to anticipate danger from a machine which was operated on the wrong side of the street in conflict with the law. The presumption is that he looked south before he left the curb to enter the pedestrian walk. The driver of the truck failed to warn him by sounding the horn. He did not slacken the speed of his truck until it was too late, when he was about 7 feet from where the deceased stood. When the deceased first became aware that the truck was coming straight toward him, he ran "northwest trying to get to the curb." In the emergency which confronted him, the deceased may not be held responsible for lack of judgment in selecting

a course to escape which proved to be more perilous. As the driver of the truck testified, he was also "cutting over toward the curb." The truck ran down George Foerster and killed him. It is true that Mr. Stone testified that when he glanced over his shoulder and saw the truck bearing down upon them, he exclaimed "Look out, there is a truck or something coming," and that he immediately ran easterly toward the center of the street to escape being hit. But Stone did not state where the machine was, or the direction from which it was approaching. Evidently, the deceased was confused and he did not know where to locate that approaching machine, even if he heard the warning from his companion, and the truck was coming from behind his back. That is a reasonable conclusion to be drawn from the fact that after Stone ran some 16 feet and stopped, he looked back and saw the deceased still standing in his original position on the pedestrian walk with his back toward the approaching truck.

It was the sole province of the jury to determine under the circumstances of this case whether the deceased was guilty of contributory negligence. The jury was fully and properly instructed upon that issue. The burden was on the defendants to prove the asserted contributory negligence of the deceased. They failed to do so. That issue was determined against them. The implied finding of the jury, in that regard, may not be disturbed on appeal, if there is any evidence or reasonable inferences to be drawn therefrom in support of the verdict. We are persuaded there is ample evidence to support the verdict on that issue. Even though reasonable minds may differ regarding the effect of the evidence of contributory negligence, this court would not be warranted in reversing the judgment on that account. (*Wynne* v. *Wright,* 105 Cal.App. 17 [286 P. 1057]; *Pinello* v. *Taylor,* 128 Cal.App. 508, 513 [17 P.2d 1039]; *Samuelson* v. *Siefer,* 62 Cal.App.2d 320, 325 [144 P.2d 879]; *Johnson* v. *Southern Pac. R. R. Co.,* 154 Cal. 285 [97 P. 520].) Under ordinary circumstances, it is not contributory negligence for a pedestrian who is crossing a duly marked highway to fail to anticipate that the driver of an automobile may endanger his life by operating his machine, contrary to law, on the wrong side of the public thoroughfare or street. In the exercise of ordinary care, a pedestrian has the right to expect that the driver of an automobile will conform to the traffic laws and that he will drive on the proper side of a marked

thoroughfare or street. (*Harris* v. *Johnson*, 174 Cal. 55 [161 P. 1155, Ann.Cas. 1918E 560, L.R.A. 1917C 477]; *Averdieck* v. *Barris*, 63 Cal.App. 495 [218 P. 786]; *Gornstein* v. *Priver*, 64 Cal.App. 249, 259 [221 P. 396]; *Wright* v. *Foreman*, 86 Cal.App. 595, 602 [261 P. 481]; 79 A.L.R. 1089, par. IV, note; 145 A.L.R. 536, note; 2 Cal.Jur. 10-Year Supp. § 248, p. 384.)

■ The attorney for plaintiff was not guilty of prejudicial misconduct in answering the question propounded to him by the judge even though the reply did disclose the fact that the mother had another son who has "since been killed in action." It does not appear that the defendants were prejudiced thereby. We may not assume that statement was wilfully made for the purpose of creating additional sympathy for the mother, or that the verdict was induced thereby. The jury was repeatedly instructed that "You cannot act upon your sympathy." Moreover, the court instructed the jury to disregard that statement. The following colloquy occurred in the examination of plaintiff on that subject: "Q. And you had one other son, is that not true? You had a son besides George? A. Yes. Q. And he was with the Royal Canadian Air Force, is that correct? A. Yes. (Mr. Neumiller): I object to the question as incompetent and immaterial. The Court: (Addressing Mr. Barnett) At present you mean? Mr. Barnett: No; at the time of the accident. He has since been killed in action, Your Honor. Mr. Neumiller: We assign counsel's remark as prejudicial error and misconduct and request the Court to instruct the jury to disregard this. . . . The Court: The objection is sustained. Mr. Neumiller: I ask again, if Your Honor please, that the Court direct this jury to disregard this prejudicial remark and misconduct of counsel. The Court: The court does not adopt counsel's language [that it is misconduct and prejudicial], but the Court does instruct the jury to disregard the statement of counsel that the witness' son has been killed— not the son who is involved in this accident—but still another son; that has no connection with the case whatsoever."

It will be observed that the witness was not asked if her other son, who was serving in the Royal Canadian Air Force, was killed in action. That reply was prompted by the inquiry of the judge. The good faith of plaintiff's attorney in asking if the witness had another son in the Canadian Air Service may be indicated by the fact that he was attempting

to account for an increased monthly payment which George made to his mother "after the other son married." She testified that George "at first . . . sent me $37.00 and then when my other son got married he increased it to $50.00. . . . When he was working there [in San Francisco] he gave me $75.00 a month."

We are of the opinion the amount of the judgment which was reduced by the trial judge to $15,000 was not excessive. This suit was brought under section 376 of the Code of Civil Procedure by the mother of a 17-year-old boy for his death caused by the wrongful act of the defendants. The boy was unmarried. The mother was living separate from her husband. The boy had been living with and regularly contributing to the support of his mother. He was a healthy, strong, capable young man. They were congenial. The measure of damages was the pecuniary loss sustained by the mother, in accordance with the proved facts, for the period of time, not only during the son's minority, but also during the term of the life expectancy of the plaintiff. She was 58 years of age at the time of the accident. The jury had a right to award damages, under the circumstances of this case, for actual pecuniary loss of contributions and services during the son's minority, and also for estimated pecuniary loss to her of "society, comfort and protection," sustained on account of her son's death. (*Peluso* v. *City Taxi Co.*, 41 Cal.App. 297, 300 [182 P. 808]; *Wong Kit* v. *Crescent Creamery Co.*, 87 Cal.App. 563, 580 [262 P. 481]; *Zeller* v. *Reid*, 26 Cal.App.2d 421 [79 P.2d 449]; *Waterbury* v. *Elysian Spring Water Co.*, 139 Cal.App. 355, 359 [33 P.2d 1048]; *Duclos* v. *Tashjian*, 32 Cal.App.2d 444, 453 [90 P.2d 140]; *Williams* v. *McDowell*, 32 Cal.App.2d 49, 53 [89 P.2d 155]; *Gilmore* v. *Los Angeles Ry. Corp.*, 211 Cal. 192, 200 [295 P. 41].) Where the evidence shows substantial pecuniary loss on account of the wrongful death of a minor child, suffered by a surviving parent having its custody, in the absence of proof to the contrary it is presumed the financial contributions and enjoyment of comfort, friendly association, and protection would continue during the life expectancy of the surviving parent. In *Parsons* v. *Easton*, 184 Cal. 764 [195 P. 419], it is said at page 772 thereof:

"The mother's age was a little under sixty years, and her expectancy of life was a little over fourteen years. This, of course, assumes ordinary good health. In the absence of

anything to the contrary, the presumption would be that the benefit to the parents from the son, if any, would have continued during her survivorship the same as during the lives of both of them.''

That presumption applies to the facts of this case. George Foerster was a capable, industrious, healthy and considerate 17-year-old son who actually contributed to his mother's support from $37 to $75 per month for several years prior to his death. The presumption is that his earning ability would increase. (*Karwoski* v. *Grant*, 30 Cal.App.2d 171, 180 [85 P.2d 944].) It was stipulated that plaintiff was 58 years of age at the time of the accident, and that the American Table of Mortality allotted to her a life expectancy of 15.39 years.

■ Without actual proof thereof courts take judicial notice of mortality tables. (*Wong Kit* v. *Crescent Creamery Co., supra*, p. 581; *Peluso* v. *City Taxi Co., supra*, p. 302; 31 C.J.S. § 99, p. 698.) The World Almanac for 1945, page 502, shows that the life expectancy of a white female, who is 58 years of age, is 18.46 years according to the United States Bureau of the Census. It is common knowledge that the life expectancy of human beings has rapidly increased in recent years on account of modern methods of living, the advanced knowledge of medicine and surgery, and of sanitary conditions. The purchasing value of money has also greatly decreased. ■ If the jury awarded plaintiff damages for actual pecuniary loss for 18.46 years at $75 per month in accordance with said maximum figures, the sum would amount to $16,614, to which it was authorized to add pecuniary loss of ''society, comfort and protection.'' We are of the opinion a reviewing court may not hold that $3,386 for that element of damages would have been excessive, under the facts of this case. That would account for the verdict of $20,000 which was rendered by the jury. Certainly we may not hold, as a matter of law, that the reduced judgment of $15,000 is excessive. It has been frequently held that a judgment for damages, which has substantial support of the evidence, will not be disturbed on appeal as excessive, unless it clearly appears to have been the result of passion or prejudice on the part of the jurors. We think the present record will not support that construction.

We conclude that the reduced judgment of $15,000 is not excessive.

Many precedents exist in the California cases in support

of the conclusion that the reduced judgment of $15,000, which was rendered in the present action, is not excessive. In *Wheeler* v. *Brown,* 47 Cal.App.2d 239 [117 P.2d 707], a verdict of $20,000 was returned by the jury in favor of a mother, as damages for the wrongful death of her son. On motion for a new trial the judgment was reduced to $15,000, which was affirmed on appeal. In *Rocca* v. *Tuolumne County Electric Power & Light Co.,* 76 Cal.App. 569 [245 P. 468], a judgment of $12,000 was awarded to the mother as damages for the wrongful death of her son. The mother had a life expectancy of only 10 years. The judgment was affirmed. In *Fortier* v. *Hogan,* 115 Cal.App. 50 [1 P.2d 23], a judgment of $9,275, which was awarded to the father of his 8-year-old child for its wrongful death was held not to be excessive. In that case, there was no evidence of the actual earning ability of the child. In *Wong Kit* v. *Crescent Creamery Co., supra,* a verdict of $5,500 for the wrongful death of plaintiff's 9-year-old boy was also affirmed on appeal. In that case there was likewise no showing that the boy then had any earning ability. In the case of *Waterbury* v. *Elysian Spring Water Co., supra,* the mother of an 11-year-old boy was awarded damages in the sum of $5,500 on account of his death caused by the negligence of the defendant. On appeal that judgment was affirmed. There was no evidence of actual earning ability of the deceased boy. Many other similar judgments have been upheld by our courts.

It is true that the trial judge in this case remarked in the very able opinion which he filed upon the motion for new trial, giving his reasons for denying the motion, conditioned upon plaintiff's acceptance of the proposed reduced judgment in the sum of $15,000, that:

"I have concluded . . . that such information [that plaintiff had recently lost another son who was serving in the Royal Canadian Air Force] was calculated to arouse the sympathy of the jury and was doubtless reflected in the amount of the award, which was larger than the evidence justified."

That is not a statement that the judge believed the jury had knowingly or wilfully rendered a verdict based either wholly or in part on sympathy. It is merely a statement that the judge thought the jury had unconsciously permitted sympathy to be "reflected" in a judgment "which was larger than the evidence justified." The jury had been repeatedly and properly instructed that it must not render a verdict

out of sympathy for the plaintiff. In the absence of evidence to the contrary we must assume the jury understood and obeyed that direction from the court. It is apparent the judge did not believe the jury deliberately rendered a verdict based in whole or in part on sympathy, for he denied the motion for new trial, which was chiefly based on that very contention. The opinion shows that the trial judge figured the actual pecuniary loss at the rate of $50 per month for only 15.39 years of additional life expectancy of the plaintiff. There is some evidence that the deceased had contributed to his mother's support the sum of $75 per month. In spite of the stipulation that the American Mortality Table allotted plaintiff a life expectancy of 15.39 years, the court was not bound by that figure. The court had a right to compute her expectancy in accordance with the later figures of the mortality table as shown by the United States Bureau of the Census and printed in the World Almanac for 1945, of which it takes judicial knowledge. We are therefore persuaded the mere amount of the verdict does not indicate that it was procured by the sympathy or by the passion or prejudice of the jury, although it was the province of the trial judge to reduce the judgment because he believed that it was otherwise excessive.

For the foregoing reasons the judgment is affirmed.

Adams, P. J., and Peek, J., concurred.

A petition for a rehearing was denied August 1, 1946, and appellants' petition for a hearing by the Supreme Court was denied September 5, 1946.