[Civ. No. 15207. Second Dist., Div. One. Aug. 12, 1946.]

ATHELINE PEARSON, Respondent, v. L. E. WHIT-WORTH et al., Appellants.

Harold E. Thomas and Hiram T. Kellogg for Appellants.

Mervin Glass and Robert A. Cushman for Respondent.

YORK, P. J.—This is an action to recover damages for injuries alleged to have been sustained by the plaintiff when she was struck down by an automobile being driven by defendant Whitworth and owned by defendant corporation.

From a judgment on the verdict in favor of the plaintiff for the sum of $10,755.30 and costs of suit, defendants prosecute this appeal urging the following as grounds for a reversal:

(1) That plaintiff failed to prove by a fair preponderance of the evidence that the automobile which struck her was owned by the Good Earth Company, or was being driven with its knowledge and consent;

(2) That plaintiff was contributively negligent as a matter of law;

(3) That the award of damages is excessive and not justified by the evidence.

The respondent Atheline Pearson testified that she alighted from the front end of a westbound "P" car on Pico Boulevard at Valencia Street in the city of Los Angeles around 4:45 p. m. on October 26, 1942, and stepped into a marked safety zone located in the northerly half of Pico Boulevard; that several other persons also alighted from the streetcar at the same intersection; that because some westbound automobiles had stopped behind the streetcar, respondent waited in the safety or loading zone to permit the streetcar and said automobiles to pass; that she then walked to the crosswalk adjoining the west end of the loading zone, it being her intention to cross Pico to the southeast corner of the intersection and thence across Valencia to Von's Market located on the southwest corner thereof. When she reached the said crosswalk she looked to see if the way across Pico Boulevard was clear, and observed an automobile approaching from the east traveling in the middle of the street between the westbound and eastbound tracks. She thought it was coming too fast, so she waited, standing near and approximately on the north rail of the westbound tracks. When she stopped the auto was 60 or 70 feet from the spot where she was standing and was approaching at a speed of from 40 to 45 miles per hour. As this automobile approached, respondent observed an el-

derly lady, who started south in the crosswalk ahead of respondent, running toward the south, whereupon the automobile "all of a sudden . . . swerved to the right and I couldn't do anything but take what was coming, it was too quick." When hit she was standing still within the lines of the crosswalk, and was knocked westerly therefrom an unknown distance, the automobile stopping in front of Von's Market on the southwest corner of the intersection. From where respondent was lying on the pavement, she saw appellant Whitworth get out of the automobile and walk back to the point where she was lying in the street; said appellant then picked her up in his arms and placed her in his automobile, which respondent testified was a "coupe"; that he then turned his car around and driving east on Pico, took her to the Georgia Street Receiving Hospital, where he waited while she was being treated, and then drove her to her home.

Phillip Schwindt, a passenger in the same westbound "P" streetcar, also alighted at Valencia Street and observed respondent as she stood in the loading zone waiting for the automobiles to pass. This witness testified he saw the automobile which subsequently struck respondent as it approached the intersection, at a speed which he estimated to be 30 to 40 miles per hour, straddling the south rail of the westbound car tracks; that it "swung out of the tracks and hit Mrs. Pearson," who was then standing "approximately at the west end of the loading zone where it joins the pedestrian crosswalk." That the right front bumper hit respondent and she was knocked or thrown a distance of 42½ feet; that the automobile traveled 50 feet plus its length from the point of impact and stopped facing westerly with its left wheels close to and just north of the north rail of the westbound streetcar tracks. This witness, an automobile mechanic, further testified that the car which struck respondent was a 1935 or 1936 Ford coupe, sort of a dull grey and needed a paint job; that he saw the driver of the car get out and identified appellant Whitworth as such driver; that said Whitworth picked up respondent, put her in the right-hand side of the car, made a "U" turn on Pico Boulevard, and drove easterly.

It was stipulated that the Good Earth Company was the owner of a Ford cabriolet and a Ford station wagon on the date of the accident.

Marvin L. Brechel, a Los Angeles City Police Officer, testified that on the afternoon of October 26, 1942, he took a

traffic accident report from appellant Whitworth at the Georgia Street Receiving Hospital; that said appellant told him that he was driving a Ford coupe, 1936 model, at the time of the accident; that Whitworth "told me he was driving his car on westbound on the westbound street car tracks of Pico and that as it passed by a safety zone at about De Long Street he heard a thump on the right hand side of his car, that he brought his car to a stop and saw a woman was lying on the street, and that he put the woman in his car and brought her to the Georgia Street Hospital." On cross-examination, this witness stated that Mr. Whitworth told him he believed that someone had walked into the side of his car and that he had looked back and had seen somebody lying there and he told the officer at the time that he was not sure that he struck anyone; that he was driving about 15 miles per hour. This officer also testified as a witness for the defense to the effect that he had talked to respondent at the Georgia Street Hospital on the same occasion, to wit: On the afternoon that she was injured and that "She told me that she had alighted from a street car into the safety zone and she intended to cross Pico from the safety zone to the south side of the street and that she was struck down. She didn't know at the time how it happened, but she said she didn't see the car prior to the impact, and she could not tell me exactly where she was standing at the time of the impact. . . . She was confused as to those details where she was standing." He further testified on cross-examination that respondent was sitting in a wheelchair in the women's ward of the hospital and complained of a pain in her back; that she did not appear to be dazed but appeared to be confused; that she told him the accident occurred at Pico and Valencia and that she was intending to go to Von's.

Appellant Whitworth testifying under section 2055, Code of Civil Procedure, stated that he was a resident of San Fernando Valley, a licensed real estate salesman and father of Bob Whitworth, who was a licensed real estate broker and one of the officers of the Good Earth Company; that he was accustomed to using a Ford cabriolet belonging to said company, which also owned a Ford station wagon; and that he used the cabriolet in the course of his business as a salesman; that on the day of the accident said witness left his home driving the Ford cabriolet, that he went to the home of his son where he changed automobiles and drove the Ford station

wagon to Los Angeles to buy a deep freezer for himself and to look for some pipe for his son; that he shopped around for the pipe but did not procure any; that about 4 in the afternoon of October 26, 1944, he was traveling west on Pico Boulevard in the Ford station wagon on his way to keep an appointment with his doctor; that he saw respondent in a safety zone at Sentous and Pico and that he was first attracted to respondent when he saw she was the victim of an accident; that she was then standing east of the center of the loading zone at said intersection and to the rear of his automobile; that he never saw her when she was in front of him; that he slowed down almost to a stop because he "felt a bump in the back of my car and I thought someone had bumped into me"; that he turned his head around when he felt the bump and saw respondent, stopped his car and went back and took respondent to the Georgia Street Receiving Hospital and later drove her to her home. Said witness stated that he was driving the station wagon; that whether he told the officer it was a Ford cabriolet he did not know, but that he might have done so. In answer to the question: "As a matter of fact, you told the police officer, did you not, you were driving a 1936 Ford coupe?", said witness stated: "I am not absolutely sure whether he made the mistake or whether I told him it was the Ford cabriolet. I will say if I did tell him it was a Ford cabriolet that was a mistake, and in confusion." This witness was cross-examined on behalf of appellant Good Earth Company and stated that he had a conversation with his son on the morning of the accident to the effect that he was permitted to "take the station wagon to make my errand for the freezer if I would bring him back the pipe and get back by 1:30."

Robert Whitworth testified that appellant L. E. Whitworth was allowed to use the Ford cabriolet owned by the Good Earth Company on October 26, 1942, any time he asked for it, and occasionally he kept it at his house overnight; that on the day in question appellant Whitworth asked permission to drive the Ford station wagon and he drove off in that vehicle; that appellant was supposed to bring it back by 1 o'clock. This witness also testified that he saw the Ford cabriolet that day after appellant left with the station wagon and that it was never out of his sight except when he went into the house to eat, and that it was parked in front of his office at 4:30 that afternoon.

■ There was sufficient evidence from which the jury could infer that the automobile which struck respondent was the Ford cabriolet owned by the Good Earth Company. Moreover, the evidence was sufficient to support the implied finding that appellant Whitworth was using and operating the automobile with the permission of such company.

The situation presented is similar to that in *Blank* v. *Coffin,* 20 Cal.2d 457, 462 [126 P.2d 868], where it was stated by the Supreme Court:

''The fact that the car was owned by defendant and was being driven by one of its employees was sufficient to permit the jury to infer that the car was being driven with defendant's permission. When defendant introduced evidence contrary to such an inference in the testimony of Coffin and Stuperich, the issue of permission could be taken from the jury and a verdict directed for the defendant only if the testimony could not be rationally disbelieved. There were several grounds upon which the jury could disbelieve the testimony. Both Stuperich and Coffin, employees of the defendant, had an interest in the outcome of the case since they would naturally wish to remain in the good graces of their employer. Coffin's testimony as to how the accident occurred directly contradicted the testimony of plaintiff's witnesses, and if the jury disbelieved Coffin in this respect, it could disbelieve him in all respects.'' See, also, *Flemmer* v. *Monckton,* 73 Cal.App.2d 271, 275, 276 [166 P.2d 380]; and *Hicks* v. *Reis,* 21 Cal.2d 654, 659 [134 P.2d 788], in the latter of which it was stated: ''Provided the trier of the facts does not act arbitrarily, he may reject *in toto* the testimony of a witness, even though the witness is uncontradicted. [citation of authorities.] As a general rule, therefore, the trier of the facts is free to disbelieve the evidence as to the non-existence of the fact of permission, and to find that it does exist solely on the basis of the inference.''

■ There is no merit in appellants' contention that respondent was guilty of contributory negligence as a matter of law. As hereinbefore stated, respondent walked a few steps westerly in the loading zone to the marked pedestrian crosswalk. She looked to see if everything was clear for her to cross the street; that, observing appellants' automobile approaching from the east between the two sets of rails at a speed which she believed to be ''a little too fast,'' she waited. The place where she stopped to wait was inside the pedestrian

zone, approximately on the north rail of the westbound tracks, and somewhat to the north of the path in which appellants' automobile was approaching the intersection. Obviously, respondent stood in a position of safety provided appellants' automobile continued to follow the course it was then traveling. Instead of so doing, appellant Whitworth swerved to the right and struck respondent. In the words of the latter "I couldn't do anything but take what was coming, it was too quick." Respondent was corroborated by the witness Schwindt. Under the circumstances presented by the instant litigation, it was the sole province of the jury to determine whether respondent was guilty of contributory. negligence, and the implied finding of such trier of the facts may not be disturbed on appeal if there is any evidence or reasonable inference to be drawn therefrom in support of the verdict. Ample evidence was presented to support the verdict on that issue. See *Foerster* v. *Direito, ante,* pp. 323, 330 [170 P.2d 986] and authorities there cited.

 Appellants finally urge that the award of damages is excessive and not justified by the evidence. In that regard, it was shown that respondent on the night of the accident was taken to the office of Clinton Roath, M.D., who treated her; that she was then very ill, unable to walk, hurt all over and had two nose bleeds; that the following day X-rays were taken at the California Hospital where she was put to bed and remained five days; thereafter she was confined to bed at her home for five weeks under the care of a nurse; that she was unable to turn over in bed and had to lie on her right side all of the time and was unable to get out of bed; that the sixth week she was permitted to sit up each day for 20 minutes and the seventh and eighth weeks she was up part of the day. She was away from her work for a period of 10 weeks. At the time of the accident, respondent was working as an operator of lathes, milling machines, drills and other machines, which work required her to stand on her feet. When she returned to work it was necessary for her to have lighter tasks which permitted her to sit while working, because she could stand only on one foot. Respondent injured her left leg, left hip, back and left shoulder, received a cut back of the left temple and a cut over the left eye leaving a scar; dislocation of the left little finger; both ankles cut; abrasion of the left hip; both eyes blackened and entire left side from shoulder to foot bruised; two upper front teeth broken off

and one other upper tooth broken. The X-rays taken at the time of respondent's injury, revealed a fracture of the descending ramus of the left pubic bone at its junction with the ischium, a slight overlapping at the point of the fracture; also some evidence of distortion in the hip socket because of an overriding of the bone at the fracture site and a little displacement upward.

At the time of trial, more than two and a half years after the accident, respondent's back, left hip and left leg still pained her continuously, the pain being sharper in cold weather. Walking tires the left leg because the left leg "is of no use to me"; sleeping on her left side is painful and keeps her awake; the use of her arms in her work causes pain in her back and hip; the hip is stiff and it is necessary for her to climb stairs by placing one foot on a step and the other beside it. Respondent testified that upon her doctor's prescription she was wearing a back brace at all times except when in bed. Examination of respondent by Dr. Taylor showed a tendency to list to the right while standing; pain in the left low back on forward bending; moderately severe pain on backward bending; more pain in bending to the left than to the right; tenderness across the entire low back and mostly across the sacroiliac region. Dr. Taylor testified: "I still believe she may be in the very early stages of a derangement of one of the cartilages of the low spine, but it is not far along and may never be far enough along to cause any serious trouble, but it might. . . . If it progresses and it is definitely established as a protruded disc (intervertebral) our treatment requires first attempt at conservative methods such as manipulation and rest in bed, and even the application of a cast for six weeks to three months, and then if it becomes persistent and we are unable to control it by conservative means we remove it"; that this would require surgery of the spine and is "quite a technical problem"; that respondent had been under treatment for a period of more than two years, and that it would probably take her another year or so to lose all her complaints; that the condition from which respondent was suffering at the time of the trial was, in said witness' opinion, caused by and as a result of the automobile accident of October, 1942.

It is firmly established by a long line of decisions that the assessment of damages is first of all the province of the jury, and secondly, the province of the trial court when passing

upon a motion for a new trial, and that an appellate court will not disturb a verdict unless it is so grossly excessive as to immediately suggest that it was the result of passion, prejudice or corruption on the part of the jury.

As stated in *Scaletta* v. *Silva*, 52 Cal.App.2d 730, 739 [126 P.2d 898] : ''It has been frequently held that the amount of money which will adequately compensate one for particular injuries received as the result of an accident, together with the pain and suffering incident thereto, rests largely in the sound discretion of the jury. This discretion may not be interfered with unless it clearly appears that the award is so grossly excessive as to shock the conscience and to enforce the conclusion that it was the result of passion and prejudice on the part of the jury. (*Rannard* v. *Harris,* 121 Cal.App. 281, 286 [8 P.2d 864] ; *Armstrong* v. *Ford,* 30 Cal.App.2d 347, 351 [86 P.2d 385] ; 20 Cal.Jur. 101, § 65.) ''

There is no evidence in the record indicating that the jury in the instant case was actuated by passion, prejudice or corruption. As a matter of fact, this was the second jury to pass upon and make the award of damages attributable to appellants' negligence, and it is noteworthy that the jury in the first trial awarded the sum of $9,710.51.

For the reasons stated, the judgment appealed from is affirmed.

Doran, J., and White, J., concurred.