[Civ. No. 14659. First Dist., Div. One. Sept. 4, 1951.]

MAY WILSON, Appellant, v. CITY AND COUNTY OF SAN FRANCISCO, Respondent.

George Devine for Appellant.

Dion R. Holm, City Attorney, and C. Wesley Davis, Deputy City Attorney, for Respondent.

PETERS, P. J.—The Reverend Dennis Wilson, a Catholic priest, was killed as a result of the admitted negligence of a motorman of a city-owned streetcar. His sister May Wilson, who was his constant and close companion, and his housekeeper and hostess, brought this action for his wrongful death. The evidence shows that she expended over $900 for funeral expenses. The jury brought in a verdict for $2,000. From the judgment entered on that verdict plaintiff appeals, her main contention being that the award is inadequate as a matter of law. With this contention we agree.

Father Wilson was 50 years old at the time of his death in 1948, in good health, and with a life expectancy of 20.91 years. Appellant was 55 years of age at the time of trial (1950), in good health, and with a life expectancy of 18.79 years. Both were born in Ireland, there being three other brothers and three other sisters. Their mother and father

are dead. Dennis was educated in Ireland and England and came to the United States in 1917 to attend a seminary in Minnesota. He was ordained in 1921. Thereafter, he served as assistant pastor in several parishes in Minnesota. In 1926 he was appointed to his own parish in that state. At that time appellant was still living in Ireland. She was his favorite sister. It had been understood between them for many years that, when Dennis got his own parish, appellant would come to the United States and take care of the parish house. After Dennis was appointed pastor he wrote several letters to appellant urging her to come to the United States. He promised that, if she would take care of his home, he would take care of her, and would take care of her future. In 1927 appellant, in response to these requests and promises, came to the United States and took up her residence in the parish house. From the beginning of this arrangement until the death of Dennis the relationship was a close and loving one. Appellant was far more than a housekeeper. She took care of the house and participated in the social life of her brother. She received no specific salary, but everything Dennis earned went into one joint pocketbook for their joint use. She received her food, clothing, shelter and medical care from this source. Anything she desired, her brother pruchased for her. He liked to sing, and for their joint pleasure he purchased a piano so that she could play for him and for their own amusement, and to entertain their guests. When Father Wilson had guests appellant was one of the party and was always referred to as "sister" or "hostess." When Father Wilson accepted invitations to eat out, or went out to eat, she always accompanied him. The relationship was loving and affectionate on both sides, she relying upon him for advice and consultation.

As pastor, Father Wilson was given a furnished house, and the utilities were paid from parish funds. He received about $1,600 a year as pastor, and, in addition, earned, and was permitted to keep, about $1,000 a year received as fees for performing marriages and officiating at funerals. Prior to 1948 the pastor was required to pay for his housekeeper out of his own funds, but since that year an allowance from parish funds of between $50 and $60 per month has been permitted. However, even after 1948, appellant did not receive a salary as such, all the income of her brother being available to her for their joint use.

Beginning in 1944 Father Wilson was able to save, net, about $100 a month. Part of this went into a joint savings

account with his sister, which account had a balance of $3,346.50 at the time of his death. Some of these savings were invested in government bonds, jointly owned, of a face value of $2,475. In addition, Father Wilson left an estate of $4,600, of which appellant was sole beneficiary, her brothers and sisters waiving their rights thereto.

Early in 1948 Father Wilson, in the company of another priest, came to California to attend an ordination ceremony. It was while he was on this trip that he visited San Francisco and was killed through the admitted negligence of respondent. Appellant paid the funeral expenses, totalling $909.74.

After the death of her brother, appellant was unemployed for about a year. During this period she lived with another brother, who is a doctor in St. Paul and who is married and has four children. One of her other brothers also lives in the United States but he, too, is married and has four children. Her other brother and her sisters still live in Ireland. She is now employed as a housekeeper by a priest in Minnesota at a salary of $50 per month, plus room and board. She must buy her own clothing, pay her own medical expenses, and pay all of her other expenses from this meager salary. She can save nothing from this salary. She is not trained to do any other kind of work. On her present job she has the status of a domestic servant. She does not participate in any way in the social life of her employer.

This is a fair summary of the evidence. On this evidence the jury brought in a verdict of $2,000. If the funeral expenses be deducted, this means an actual award of less than $1,100 as the pecuniary measure of the financial loss, loss of society, comfort, care, advice, assistance and protection here shown to exist. We have no hesitancy in stating that such an award shocks the conscience, is inadequate as a matter of law, and must be reversed.

We are well aware of the rule that the question of damages is primarily a question for the trial court, and that the power of the appellate court over the award is strictly limited. (*Finley* v. *Steiner,* 40 Cal.App.2d 331 [104 P.2d 819].) But, of course, if the award, as a matter of law, is not supported by the evidence, a reversal should be ordered, as it would if any other material finding is unsupported. (*Weiskopf* v. *Smith,* 44 Cal.App.2d 438 [112 P.2d 665] ; *Price* v. *McComish,* 22 Cal.App.2d 92 [70 P.2d 978].) That is this case.

Here we have more than a brother-and-sister relationship. Factually, it resembles a father-and-daughter relationship. Appellant lived with her brother. She shared his social life and his hours of relaxation. She acted as his housekeeper and hostess. There was a fond, kindly, gracious, and loving relationship between them. Appellant was dependent upon her brother for her support and for the protection of her future. She had left her home in Ireland and came to the United States upon his promise to keep her and to protect her future. The decedent was saving $1,200 a year at the time of his death, and this was used for their joint protection. During her left expectancy (which was shorter than her brother's) he would have saved over $20,000. She could have anticipated that, had anything happened to him, these savings would belong to her—in fact, a major portion of the savings were in their joint names. ██ Legally, of course, it must be presumed that the financial contributions and benefits would continue (*Foerster* v. *Direito*, 75 Cal.App.2d 323 [170 P.2d 986]) during the life expectancy of the survivor. It is obvious that decedent's capacity to earn would not, reasonably, have decreased in his lifetime. Appellant was, and reasonably could assume she would continue to be, the recipient of decedent's bounty and support. ██ In addition, the pecuniary value of the loss of comfort, protection and society is an element of damages. (*Foerster* v. *Direito,* 75 Cal.App.2d 323 [170 P.2d 986]; *Gilmore* v. *Los Angeles Ry. Corp.*, 211 Cal. 192 [295 P. 41]; *Holder* v. *Key System*, 88 Cal.App.2d 925 [200 P.2d 98].)

Usually wrongful death cases are brought by children for the death of the parent, or one spouse for the death of the other, where a legal obligation to support exists and need not be proved. ██ But a sister or brother may maintain such an action where pecuniary loss has resulted from the death. (*Montanez* v. *Beard,* 207 Cal. 379 [278 P. 858]; *Burk* v. *Arcata & Mad River R. R. Co.,* 125 Cal. 364 [57 P. 1065, 73 Am.St.Rep. 52].) ██ Collateral heirs may recover when, as here, they show loss of support and a reasonable probability that the society, comfort and protection of the decedent was of such a character that it was of pecuniary advantage to the plaintiff. (See cases collected 8 Cal.Jur. p. 1007, § 53.) ██ Collateral heirs must prove their pecuniary loss or their recovery will be limited to nominal damages. But here the proof showed such loss, far in excess of the award, by evidence that was clear and uncontradicted.

After funeral expenses are deducted the award is for but about $1,100. ■ Funeral expenses are, of course, an element of recovery. (*Adams* v. *Southern Pac. Co.*, 4 Cal.2d 731 [53 P.2d 121].) ■ The amount received by appellant from the estate of her brother or from the joint tenancies cannot be considered as an offset against the award. (*McLaughlin* v. *United Railroads*, 169 Cal. 494 [147 P. 149, Ann.Cas. 1916D 337, L.R.A. 1915E 1205].) There is no logical interpretation of the evidence that could possibly support the allowance of such an award. The award is totally unsupported by the evidence, is inadequate as a matter of law, and must be reversed.

The judgment appealed from is reversed.

Bray, J., and Wood (Fred B.), J., concurred.