UNITED AIR LINES, INC., Appellant,

v.

Janice WIENER et al. and Catherine B. Nollenberger, et al. (excluding Faith C. Paris et al.), Appellees.

UNITED STATES of America, Appellant,

v.

Janice WIENER et al., Appellees.

Nos. 18510–18533, 18866–18872.

United States Court of Appeals Ninth Circuit.

June 24, 1964.

Rehearing Denied Sept. 11, 1964.

Certiorari Dismissed Dec. 16, 1964.

See 85 S.Ct. 452.

384

Hugh B. Rotchford, James J. McCarthy, Chase, Rotchford, Downen & Drukker, Pierce Works, William W. Vaughn, O'Melveny & Myers, Los Angeles, Cal., for appellant-cross appellee United Air Lines, Inc.

Francis C. Whelan, U. S. Atty., Donald A. Fareed, Asst. U. S. Atty., Chief of Civil Section, Donald J. Merriman, Asst. U. S. Atty., Los Angeles, Cal., for appellee-cross appellant United States of America.

Frank Belcher, Belcher, Henzie & Fargo, Ben. Margolis, Margolis & McTernan, Los Angeles, Cal., for appellees.

Before POPE, HAMLEY and JERTBERG, Circuit Judges.

JERTBERG, Circuit Judge.

These appeals are from judgments in thirty-one cases arising out of a mid-air collision between a DC–7 propeller driven commercial airliner owned and operated by United Air Lines (hereinafter "United") and an F–100F United States Air Force jet fighter. The collision occurred on April 21, 1958, near Las Vegas, Nevada. The DC–7 was carrying 42 passengers and a crew of 5; the jet was carrying two Air Force pilots. There were no survivors.

All of the actions were brought under the Nevada Wrongful Death Statutes: Nev.Rev.Stats. §§ 12.090, 41.080, 41.090.

In all 31 cases, the plaintiff's decedents were passengers for hire on United's DC–7, including 7 civilian employees of the government and two members of the Armed Forces, all of whom were traveling in the line of duty as such. We will hereinafter refer to 22 nongovernment employee cases and 9 government employee cases. United was a defendant in all 31 actions, and the United States of America (hereinafter "the government") was a co-defendant in the 22 nongovernment employee cases. In 5 of the 9 government employee cases, the government, as co-plaintiff, sued United as a statutory subrogee in enforcement of its lien rights under the Federal Employees' Compensation Act: 5 U.S.C. §§ 751 et seq., 776. In the 22 nongovernment employee cases, the government sought contribution from United; United sought indemnity from the government in all 31 cases.

Twenty-four of the suits (the 22 nongovernment employee cases and two of the government employee cases) were filed in the Southern District of California where they were tried together on a consolidated basis.[1] All of these were tried to a jury as to United, and the 22 nongovernment employee cases in this group were tried as to the government to the same jury on an advisory basis, followed by court findings of fact and conclusions of law. The claims between United and the government on the issues of contribution and indemnity were tried to the court. Judgments were entered in favor of the plaintiffs in these 24 cases; United and the government were granted contribution each against the other in the 22 nongovernment employee cases; United was denied indemnity from the government in all 24 cases. See Wiener v. United Air Lines, 216 F.Supp. 701 (S.D.Cal.1962); Rhoades v. United States, 216 F.Supp. 732 (S.D.Cal. 1962). This group of 24 cases is referred to by the parties as the "Wiener cases", a designation adopted herein.

1. In United Air Lines Inc. v. Wiener, 286 F.2d 302 (9th Cir. 1961) we held that there could not be separate trials on the issue of damages and the issue of liability in these cases.

The remaining seven cases, all involving government employees and including the five cases in which the government sued as a co-plaintiff, were pending against United in the District of Nevada at the close of trial in the Wiener cases. These cases are referred to as the "Nevada cases" and were presided over by the same district judge who presided over the Wiener cases. The District Court for the District of Nevada granted motions for summary judgments in favor of the plaintiffs and against United on the issue of liability in these cases on the ground that United was collaterally estopped to deny liability to the plaintiffs therein under the doctrine of res judicata by virtue of the verdicts and judgments in the Wiener cases. United States v. United Air Lines, 216 F.Supp. 709, 729 (D.Nev.1962). Thereafter, upon stipulation of the parties as to *forum non conveniens,* the cases were transferred to the District Court for the Southern District of California for trial on the issue of damages only. After having been transferred, the Nevada cases were tried together to a jury other than that previously empaneled in the Wiener cases on the issue of damages in each case. In two of these cases the court increased the amount of damages returned by the jury in the respective verdicts. See Nollenberger v. United Air Lines, 216 F.Supp. 734 (S.D.Cal. 1962.) The District Court dismissed United's claims against the government for indemnity in all the Nevada cases.

United and the government each appeals from the judgments rendered against them and in favor of the passengers' representatives (hereinafter appellees). United appeals from the denial of indemnity over against the government in all 31 cases, from the awards of contribution to the government, and from the lower court's action increasing the amount of damages returned by the jury in two of the Nevada cases. The government appeals from the district court's action in limiting the amount of contribution by United in three cases. None of the parties specifies error regarding the admission or exclusion of evidence.

Before discussion in detail the issues raised in these appeals, we shall summarize those findings of fact made by the district court which are not in dispute in an effort to describe the circumstances of the collision.

United's Flight 736 was a regularly scheduled flight which departed Los Angeles International Airport at 7:37 a. m. on April 21, 1958. Prior to takeoff, United filed with the Civil Aeronautics Administration (CAA) Air Route Traffic Control Center at Los Angeles an Instrument Flight Rules (IFR) flight plan which proposed the use, inter alia, of Victor 8 airway to Denver, Colorado. The flight plan also proposed a cruising altitude of 21,000 feet mean sea level, a true air speed of 305 knots, and a departure time of 7:35. Victor 8 airway was a major transcontinental airway established by the CAA in 1952 and was used extensively by air traffic including large passenger airliners such as United's DC–7. Victor 8 airway includes the navigable airspace up to an elevation of 27,000 feet mean sea level above the earth's surface within five statute miles of each side of a prescribed center line. It extends from Long Beach, California, to Washington, D. C., and passes over Las Vegas, Nevada. It was common knowledge that Victor 8 was a regular route for two-way traffic at the time of the accident. The Air Route Traffic Control Center of the CAA at Los Angeles issued an IFR air traffic clearance to Flight 736 to proceed to Denver in accordance with the proposed flight plan, which clearance was acknowledged by the flight. A copy of the flight plan was immediately forwarded by teletype from the Los Angeles Center to the Salt Lake City, Utah, Center of the CAA. At about 8:14, the CAA Centers at Los Angeles and Salt Lake City received a report from Aeronautical Radio, Inc., which serves under contract to United as a radio communicating facility, that Flight 736 had estimated its time of ar-

rival over McCarran Field at Las Vegas, Nevada, at 8:31.

At approximately 7:45 that morning an Air Force F–100F Super Sabre Jet fighter took off from Nellis Air Force Base near Las Vegas, Nevada, on a training flight carrying an instructor pilot in the front seat and a student pilot in the rear seat. Prior to takeoff the pilots of the F–100F received an authorization from their Squadron Operations Officer for a local flight under Visual Flight Rules (VFR) conditions. Nellis Air Force Base was located at the northeasterly edge of Las Vegas within the lateral confines of Victor 8 airway.

During the training flight of the F–100F the student pilot was to receive training in primary instrument maneuvers in an area away from Victor 8 designated for that purpose. On his way back to Nellis, the student was to engage in a practice teardrop instrument penetration involving a descent and approach to Nellis under simulated instrument flying conditions. At all times during the training flight, the student was under a hood and was unable to see outside of the cockpit in which he was seated. It was to be his first such instrument penetration or let-down procedure in a F–100F type aircraft, although he had had previous experience in such procedure in a T–33 jet. The instructor pilot, who had never previously been on an instrument mission with this student, occupied the front seat and had two-way microphone communication available at all times with the student. It was the instructor's duty to instruct the pilot in the rear seat, to monitor each step of his performance, to monitor the engine, navigation and other instruments of the plane, and to maintain a visual lookout for other aircraft. The F–100F had dual pilot controls and the instructor could take over the operation and control of the jet at any time.

The practice teardrop instrument penetration was to be executed in conformity with a procedure known as the KRAM procedure. This KRAM procedure was designed by the Commanding General of Nellis Air Force Base and his subordinates (hereinafter "Nellis Command") and used as a "fix" for initiating and concluding the penetration of the commercial broadcast radio station KRAM located on the easterly edge of Las Vegas within the lateral boundaries of Victor 8 airway. An aircraft engaged in this procedure was to pass over the radio station's transmitter, execute a right turn at a bank of thirty degrees while descending, and pass over the transmitter again at an elevation lower than its initial pass. The path prescribed by the KRAM procedure lay, for the most part, within the lateral confines of Victor 8 at altitudes customarily used by commercial passenger planes. The term "teardrop" derives its name from the fact that the path of the plane executing the KRAM procedure, if drawn on the earth, would resemble the shape of a teardrop, the pointed end being located at station KRAM.

At approximately 8:23 a. m., the F–100F called Nellis VFR Control and reported it was inbound to KRAM. While in flight, the F–100F requested from Nellis VFR Control an altitude assignment from which it could conduct the KRAM procedure. The VFR Controller assigned the aircraft an altitude of 28,000 feet and advised it to report over the radio station. At approximately 8:27 the flight reported that it was over KRAM and requested a penetration clearance. The Controller cleared the F–100F for immediate penetration and requested that it report the penetration turn. At 8:29, the F–100F reported departing 28,000 feet. There were no other reports from the flight in connection with this procedure prior to the collision. The F–100F approached KRAM from a generally easterly direction. The pilots of the jet flew it in such a fashion that the plane, after passing over KRAM, never got on the path prescribed by the KRAM procedure. After passing in a generally westerly direction over station KRAM the plane was at all times within the Victor 8 airway.

At about 8:30, the F–100F and the DC–7 collided at an altitude of approximately 21,000 feet and within the confines of Victor 8. It appears that the jet was descending while executing or attempting to execute a practice KRAM procedure, as it approached the DC–7; that as it converged upon the DC–7, the DC–7 was to the right of the jet; that the jet passed in front of the nose of the DC–7; and that the right wing-tip of the jet made impact with the right wing-tip of the DC–7. The true air speed of the F–100F at the time of impact was 495 miles per hour or more; that of the DC–7 was approximately 350 miles per hour. The collision occurred during daylight, the skies were clear and visibility was virtually unlimited (35 miles).

Nellis VFR Control is a radio facility at Nellis Air Force Base used as a training aid by Nellis Command. It was designed to and did provide actual separation between Nellis aircraft practicing various procedures, including the KRAM procedure, but not between such Nellis aircraft and any other users of the air space. Nellis VFR Control had a direct telephone line to Nellis Tower. Nellis Tower was connected by direct telephone circuits with the CAA facilities at McCarran Field (Las Vegas), and the Air Route Traffic Control Centers of the CAA at Salt Lake City and Los Angeles. Two-way communication between the F–100F and both Nellis Tower and Las Vegas Approach Control at McCarran Field was available at all times during the flight of the F–100F. At the time of the accident, Nellis Tower personnel could have obtained information on IFR traffic by calling the Salt Lake Air Route Traffic Control Center on a direct open telephone line or by calling Las Vegas Approach Control and requesting that such information be obtained. Neither Nellis Command nor the pilots of the F–100F secured or attempted to secure any IFR clearance for the F–100F from the CAA, nor did they secure or attempt to secure any air traffic information on the date of the accident. If such request for

IFR clearance had been made, clearance for an immediate KRAM procedure would have been denied with instructions to engage in activities which would assure separation between the jet and the DC–7. Nellis Command made no inquiries of the CAA or any other source on or prior to the date of the accident to determine the times and altitudes at which airline traffic using Victor 8 would be in the vicinity of Las Vegas, Nevada, or concerning the volume and flow of traffic on that airway.

The volume of high speed military jet traffic in the vicinity of Nellis Air Force Base, which encroached upon Victor 8 airway, during the daytime hours Monday through Friday at the time of the accident, was heavy and continuous. At the time of the accident during said daytime hours there was an arrival or departure to and from Nellis approximately every forty-five seconds, with a large part of the climb-out and approach of each arrival or departure taking place on Victor 8. At any given time during each of said days there were approximately fifty to sixty jet aircraft from Nellis in the air. Nellis jet aircraft averaged one crossing per minute over Victor 8; the number of practice instrument jet penetrations at Nellis using radio facilities in or near Las Vegas ranged between twenty to sixty per day; there was a jet penetration on an average of one every fifteen minutes, of which ten to twenty per day used Station KRAM as a "fix". Nellis planes and other military planes engaged in low frequency radio range orientation practice on Victor 8 airway in which student pilots flying blind under the hood, with observer pilots, were seeking to orient themselves to the range facilities. A major portion of the flying described above took place at altitudes ordinarily used by en route commercial passenger planes. The Nellis training area covered approximately 40,000 square miles which was bisected southwesterly to northeasterly by Victor 8 airway. Training activities of various kinds had been conducted by Nellis for several years prior to the date

of the accident and at times the volume of aircraft involved therein greatly exceeded the foregoing.

All of the district court's findings of specific acts of negligence on the part of the government are in dispute and may be summarized as follows:

Failure to secure an IFR clearance or traffic information by or for the jet pilots or to establish a procedure in this regard;

Failure to utilize available radio facilities for the requesting of an IFR clearance;

Failure to make inquiry as to airline traffic on Victor 8 airway;

Failure to extend speed brakes of the F–100F;

Failure to yield right-of-way;

Failure to design the KRAM procedure so as to avoid Victor 8 airway at altitudes regularly used by en route commercial passenger planes;

Failure to make a study of commercial traffic in the area and to design and utilize the KRAM procedure in light of such study;

Failure to coordinate the KRAM procedure with United or other commercial facilities utilizing Victor 8;

Failure to inform and warn F–100F pilots of hazards of collision within Victor 8 airway and to instruct them to exercise extreme caution therein;

Failure to give notice to United or to other airline carriers of the KRAM simulated instrument penetration procedure being practiced under visual flight rules in the Las Vegas-Nellis area, though giving Flight 736 a clearance under instrument flight rules through the area;

The manner in which the F–100F pilots operated and controlled their plane while in the air on the date of the accident;

The establishment and use of the KRAM procedure under VFR conditions;

Failure of the crew of the F–100F to see and avoid the DC–7.

All of the district court's findings of specific acts of negligence on the part of United are in dispute and may be summarized as follows:

Failure of the crew to see the F–100F and to initiate evasive action to avoid the same;

Failure of United to have knowledge of the details of the flying activities on and across Victor 8 airway in the Las Vegas area, including knowledge of the KRAM jet penetration procedure;

Failure to instruct or train its crews on the subject of systematically scanning for other aircraft and in leaving the manner in which scanning was handled to each individual flight captain;

Failure adequately to inform and instruct its crews "relating to the dangerous operation of its aircraft through the Las Vegas area."

We shall next discuss the parties' specifications of error in the following order: United's liability to the appellees; government's liability to the appellees in the 22 nongovernment employee cases; the questions of contribution and indemnity; the propriety of granting summary judgments to the plaintiffs in the Nevada group of cases; and the propriety of the court's action in increasing the damage awards in two of the Nevada cases. In view of our disposition of the appeals, we do not reach the specification that the court erred in limiting United's contribution to the government in three cases.

## UNITED'S LIABILITY TO APPELLEES
### Sufficiency of the Evidence

■ United contends that there is insufficient evidence to support the findings of the lower court, and what it terms the implied findings of the jury, that it was guilty of negligence which was a proximate or contributing cause of the collision. The findings of the lower court which United attacks in this regard fall into two categories: (1) negligent omissions on the part of United's

crew at or about the time of the collision; (2) negligent precollision omissions regarding knowledge of conditions in the Las Vegas-Nellis Field area and regarding crew training in the light of those conditions. In discussing these findings it must be borne in mind that United, as a common carrier, owed its passengers the duty of utmost care for their safety.

It is United's contention that since the angle of descent of the jet at the time of impact was 17 degrees and since the range of vision upward of the DC-7's crew, due to structural limitations of the windscreen, was limited to approximately 10 degrees above the horizontal, the crew of the DC-7 could not have seen the descending jet until practically the very instant of impact. The difficulty with this proposition lies in the two premises it expresses. The computation of 17 degrees was made by a study of the wreckage from which it was possible to establish the relative position of the two planes at the instant of impact. The district court made no specific finding regarding the angle or angles of descent described by the jet from its altitude of 28,000 feet to the point of collision, 21,-000 feet. There is evidence that the jet made this descent of 7,000 feet in approximately two minutes; that mathematical computations demonstrate that if the jet had been descending at an angle of 17 degrees for two minutes it would have been at an altitude of less than 8,000 feet and there would have been no collision; and that the jet, at the time of impact, was engaged in an evasive maneuver (a 90 degree bank) which would have the effect of increasing its angle of descent. This and other evidence would tend to support an inference that the jet was descending, prior to executing an evasive maneuver, at an angle of about 5 degrees, which is the angle prescribed by the KRAM procedure. This inference finds further support in the results of five test flights flown by an Air Force test pilot three days after the collision. The only evidence in the entire record lending support to the premise that the range of vision of the DC-7's crew was limited to 10 degrees above the horizontal was the equivocal testimony given by the Government's deposition witness offered at trial by United.[2]

The foregoing at least creates a conflict with the factual premises upon which rests United's conclusion that its crew could not have seen the jet until immediately prior to the collision. This conflict was resolved against United by the triers of fact, and we are unable to say that clear error was committed thereby. The legal obligation of the DC-7's crew was to see and avoid the jet, under the optimum visibility conditions then existing, is clear: responsibility for the separation of two aircraft flying in visual flight rule weather, regardless of the type flight plan or air traffic clearance, rests directly upon the operating personnel of the respective aircraft.[3] This obligation was not relieved by the jet's failure to yield the right of way to the DC-7.[4] While neither United nor the government assert that the evidence compels the conclusion that the rate of clo-

2. " 'Q. * * * You assumed, in the case of each pilot, that is, the pilot of the jet and of the DC-7, a vertical search of 20 degrees. Is that right?

" 'A. That is correct.

" 'Q. That is ten degrees above and below horizontal or at least the direction you are looking straight ahead?

" 'A. That is approximately right.

" 'Q. Is that approximately the normal search area, the vertical search area?

" 'A. It should be, yes. This will vary from cockpit to cockpit, because of limitations.

" 'Q. If a plane were descending at an angle of over ten degrees, even slightly over ten degrees, it would certainly decrease the likelihood of seeing that plane, wouldn't it?

" 'A. Yes, if it were outside of range of scan, it wouldn't be seen.' "

3. United States v. Schultetus, 277 F.2d 322 (5th Cir. 1960), cert. den. 364 U.S. 828, 81 S.Ct. 67, 5 L.Ed.2d 56 (1960); United States v. Miller, 303 F.2d 703 (9th Cir. 1962), cert. den. 371 U.S. 955, 83 S.Ct. 507, 9 L.Ed.2d 502 (1963).

4. Ibid.

sure between the two planes (estimated at 774 miles per hour) was so great that their pilots lacked the ability to see the other plane in time to take evasive action which would have avoided the collision, there is much reference to evidence of experts who testified as to the percentage of probability of the pilots of the two planes seeing and avoiding. These experts were not in agreement on the matter and there is sufficient evidence to support the conclusion that the pilots of each of the planes involved could have prevented the accident by seeing and avoiding the other plane. In view of this evidence, we will not disturb the findings thereupon.

■ With respect to the findings of United's pre-collision negligence, the district court found that United in fact was not aware of the KRAM procedure being conducted at Nellis. There is evidence sufficient to support the findings that United had knowledge of the following: that Nellis was a training base for jet aircraft; that Nellis jets descended on Victor 8 at speeds of approximately 500 miles per hour through the 21,000 foot altitude where the collision occurred; that Air Force jets were flying without IFR clearances in the Las Vegas-Nellis area; that United's pilots would have to rely upon seeing and avoiding these jets to prevent collisions; and that there had been reports by United's pilots not only of hazardous conditions generally but also of two near-misses between Air Force jets and United passenger planes in the area in 1957. There is evidence that United's Las Vegas station manager received, at a meeting of the aviation committee of the Las Vegas Chamber of Commerce held about nine months prior to the collision, a map which was distributed in the course of a talk given by an officer from Nellis base. The map indicated areas established for flying activities in the Nellis area including one designated "instrument area" shown by a circle around Nellis field. The evidence is inconclusive as to the explanation given about such flying activities during the course of the talk. This map was transmitted by the station manager to United's Los Angeles flight operations office. The district court felt that while United had no actual knowledge of the details of the KRAM procedure, it was put on notice sufficient to make inquiry, and that "in the exercise of ordinary care could and should have had knowledge of * * * the KRAM jet penetration procedure * * *." We are unable to say that it was clear error to find that in light of such knowledge United should have taken precautionary crew training measures to lessen the risk of mid-air collisions in the Las Vegas-Nellis area.

United's contention that such omissions should not be considered a proximate cause of the collision is predicated upon the factual assumption that it would been impossible for the crew to see the jet in time to avoid the collision. As discussed above, we are unable to accept this factual assumption.

*Res Ipsa Loquitur*

United's next specification of error has to do with the district court's instructions with reference to the doctrine of res ipsa loquitur. United complains that the court erred (1) in giving any instruction on the doctrine at all and (2) in refusing to instruct that the doctrine applies only in the event that the jury found United to have been in exclusive control of the instrumentality causing the accident. It is United's contention that both errors stem from the lower court's erroneous choice of the law governing the applicability of res ipsa loquitur. While conceding that the instructions as given were proper under California law, United contends that it is uncertain under Nevada law whether the doctrine is applicable at all to a collision case, but that in any event Nevada has not abandoned the element of exclusive control of the instrumentality causing the injury as a prerequisite to the applicability of the doctrine. There is some doubt whether United is correct in its interpretation of Nevada law, but we deem it sufficient to hold that the district court correctly instructed the jury according to the law of the forum.

Under the rule of Erie R. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), it is settled that the doctrine of res ipsa loquitur sufficiently affects the outcome of the litigation to require the federal courts to follow state law. E. g., Lobel v. American Airlines, Inc., 192 F.2d 217 (2d Cir. 1951), cert. den. 342 U.S. 945, 72 S.Ct. 558, 96 L.Ed. 703 (1952). In so doing, the district court was required to follow the conflict of laws rules prevailing in California, Klaxon Co. v. Stentor Electric Mfg. Co., 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941), in order to determine whether a California state court would have applied the law of California or the law of Nevada on the res ipsa doctrine. A California court's choice of law in this regard would depend upon the characterization of the doctrine as "substantive" or "procedural". California courts will characterize a rule as substantive or procedural for choice of law purposes according to its own law, not some other law. Grant v. McAuliffe, 41 Cal.2d 859, 863–867, 264 P.2d 944, 946–949, 42 A.L.R.2d 1162 (1953); Biewend v. Biewend, 17 Cal.2d 108, 109, 109 P.2d 701, 132 A.L.R. 1264 (1941); Miller v. Lane, 160 Cal. 90, 116 P. 58 (1911); 11 Cal.Jur.2d, Conflict of Laws § 87; accord, Restatement, Conflict of Laws, § 584. There is no merit in United's contention that the district court should have followed Nevada's classification or that a California court would have done so. Lobel v. American Airlines, Inc., supra; Moran v. Pittsburgh-Des Moines Steel Co., 166 F.2d 908 (3d Cir.1948); cert. den. 334 U.S. 846, 68 S.Ct. 1516, 92 L.Ed. 1770 (1948); Anno. 21 A.L.R. 2d 247, 258–261; contra, Lachman v. Pennsylvania Greyhound Lines, 160 F.2d 496 (4th Cir.1947); Smith v. Pennsylvania Central Airlines Corp., 76 F.Supp. 940, 6 A.L.R.2d 521 (D.C.D.C.1948).

The parties concede that California courts have never expressly classified the res ipsa loquitur doctrine as substantive or procedural for choice of law purposes. However, California courts have characterized the doctrine as a rule of circumstantial evidence, which gives rise to an inference of negligence. Ybarra v. Spangard, 25 Cal.2d 486, 154 P.2d 687, 689, 162 A.L.R. 1258 (1944); see Orr v. Southern Pac. Co., 226 F.2d 841 (9th Cir.1955). California follows the settled rule of Restatement, Conflict of Laws, § 595, that the law of the forum governs the proof of the facts alleged and also determines presumptions and inferences to be drawn from evidence. Pfingsten v. Westenhaver, 39 Cal.2d 12, 244 P.2d 395 (1952); Hamlet v. Hook, 106 Cal.App.2d 791, 236 P.2d 196 (1951); Estate of Winder, 98 Cal. App.2d 78, 219 P.2d 18 (1950). Dealing with an identical posture of New York law, the court in Lobel v. American Airlines, supra, said, 192 F.2d at 219:

"Although [the New York courts] have not ruled on the precise question before us here, they have said, in cases involving burden of proof, that local law governs even though the accident occurred out-of-state. [Citations omitted.] If they follow local law in so vital a matter as burden of proof it seems *a fortiori true* that they would not bow to foreign law where a mere rule of evidence was concerned."

United stresses that were a question to arise in a California court as to the sufficiency of allegations in a complaint to state a cause of action based upon Nevada's wrongful death statutes, Nevada law would govern, citing Emery v. Emery, 45 Cal.2d 421, 289 P.2d 218 (1955). It then argues that the question as to whether the plaintiff has proved his case would likewise be decided by reference to Nevada law since, under the familiar law of variance, the *allegata* and the *probata* must correspond. The materiality of rules of variance to the instant question eludes us. The character and sufficiency of the evidence to sustain allegations invoking the provisions of a foreign statute is a procedural matter in California. Pfingsten v. Westenhaver, supra; Cobb v. Lawrence, 54 Cal.App.2d 630, 129 P.2d 462 (1942); DuBois v. Owen, 16 Cal.App.2d 552, 60 P.2d

1019 (1936); Tevis v. Pitcher, 10 Cal. 465 (1858). "In action on torts occurring abroad, the courts of this state determine the substantive matters *inherent in the cause of action* by adopting as their own the law of the place where the tortious acts occurred * * *." Grant v. McAuliffe, supra, 41 Cal.2d at 862, 264 P.2d at 946, 42 A.L.R.2d 1162 (emphasis added). A limitation in the applicability of a general rule of evidence under Nevada law does not seem to us to be "inherent in the cause of action" created by its wrongful death statute.

## GOVERNMENT'S LIABILITY TO APPELLEES

### Sufficiency of the Evidence

 Turning now to the Government's liability to the appellees in the 22 nongovernment employee cases, it is to be noted that while the pilots of the jet owed the duty of ordinary care to the passengers of the DC–7, as opposed to the higher degree of care owed them by United, the responsibility to see and avoid was the same for the operating personnel of both aircraft. There was the further responsibility of the pilots of the jet to yield the right of way to the DC–7, and their failure to do so is not controverted by the Government. The Government contends that the evidence supports only the conclusion that the instructor pilot did see and did attempt to avoid colliding with the DC–7 by engaging in a last minute evasive maneuver consisting of retracting the jet's speed brakes and rolling into a 90 degree bank. Such contention, if accepted, does not exonerate the Government from liability.

 With respect to the finding that the pilots negligently failed to extend the jet's speed brakes, there was no direct evidence as to whether the brakes were extended during the jet's execution of the KRAM procedure, as the Government contends and as the KRAM procedure requires, and then retracted during an evasive maneuver or whether they were never extended at all. The triers of fact were thus called upon to draw an inference based upon the proven fact

that the brakes were found in the debris in a retracted position; there was no error in adopting the inference contrary to the Government's contention. The findings of pilot negligence are not clearly erroneous.

### Federal Tort Claims Act

The Government's next specifications of error are based upon the provisions of the Tort Claims Act which exempt the Government from liability for discretionary acts and misrepresentation. The findings of fact attacked as contrary to the discretionary function exception fall into three groups which may be summarized: that Nellis Command was negligent in the establishment and the continued use of the KRAM procedure; that having established the KRAM procedure, the actual use, or conduct of operations thereon, by Nellis Command was negligent; and that the officials of the CAA negligently failed to notify United as to the existence and utilization of the KRAM procedure.

 28 U.S.C. § 2680(a), referred to herein as the discretionary function exception to the Tort Claims Act, provides in part:

"The provisions of this chapter and section 1346(b) of the title shall not apply to * * * [a]ny claim * * * based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused."

Location of the boundaries of the discretionary function exception of the Tort Claims Act has been the subject of much litigation. In United States v. Hunsucker, 314 F.2d 98 (9th Cir. 1962), we observed, after reviewing the pertinent decisions that the generally accepted view includes within the exception decisions made at the planning level as distinguished from decisions made on the operational level of governmental activities.

Cases which illustrate the line of demarcation are as follows: discretionary to undertake fire-fighting,[5] lighthouse,[6] rescue,[7] or wrecked-ship marking[8] services, but not discretionary to conduct such operations negligently, discretionary to admit a patient to an Army hospital, but not discretionary to treat the patient in a negligent manner;[9] discretionary to establish a post office at a particular location, but not to negligently fail to install handrails;[10] discretionary to establish control towers at airports and to undertake air traffic separation, but not to conduct the same negligently;[11] discretionary to reactivate an airbase, but not to construct a drainage and disposal system thereon in a negligent fashion:[12] and discretionary for CAA to conduct a survey in low flying, twin-engine airplane, but not for pilots thereof to fly negligently.[13]

We accept the Government's assertions that the training of pilots under simulated conditions for instrument approaches is an integral and necessary segment of the mission of the Air Force; that a standardized instrument approach procedure, such as the teardrop pattern, is desirable in view of exigencies of military flying operations; and that instrument approach training is an Air Force activity initiated at the planning level of the Air Force. We also recognize the holding of Dalehite v. United States, 346 U.S. 15 (1953), stated at 35–36, 73 S.Ct. 956, at 968, 97 L.Ed. 1427 that:

" * * * the 'discretionary function or duty' that cannot form a basis for suit under the Tort Claims

Act includes more than the initiation of programs and activities. It also includes determinations made by executives or administrators in establishing plans, specifications or schedules of operations. Where there is room for policy judgment and decision there is discretion. It necessarily follows that acts of subordinates in carrying out the operations of government in accordance with official directions cannot be actionable."

The contention made by appellees and United is, however, that when official directions leave no room for policy judgment and decision, the disregard of those directions by subordinates is not discretionary. The official directions which they contend were disregarded in the establishment of KRAM are contained in Air Force Regulation (hereafter AFR) No. 55–19, issued by the Department of the Air Force, July 13, 1956, and signed by N. F. Twining, Chief of Staff, United States Air Force, the provisions of which are reproduced in the appendix to this opinion. The government's brief concedes, indeed is at pains to demonstrate, that the establishment of the KRAM procedure, its continued use and operation were made by Nellis Command in response to AFR 55–19.

It will be noted that the purpose of the regulation is to provide "guidance for commanders, pilots, and air traffic control personnel for insuring maximum safety and efficiency in their local flying operations." Section 1 of the regulation enjoins Nellis Command to estab-

5. Rayonier, Inc. v. United States, 352 U.S. 315, 77 S.Ct. 374, 1 L.Ed.2d 354 (1957).

6. Indian Towing Co. v. United States, 350 U.S. 61, 76 S.Ct. 122, 100 L.Ed. 48 (1955).

7. United States v. Lawter, 219 F.2d 559 (5th Cir. 1955); United States v. De-Vane, 306 F.2d 182 (5th Cir. 1962).

8. Somerset Seafood Co. v. United States, 193 F.2d 631 (4th Cir. 1951).

9. Costley v. United States, 181 F.2d 723 (5th Cir. 1950).

10. American Exchange Bank of Madison, Wis. v. United States, 257 F.2d 938, 78 A.L.R.2d 879 (7th Cir. 1958).

11. United States (Eastern Air Lines) v. Union Trust Co., 95 U.S.App.D.C. 189, 221 F.2d 62 (1955); affirmed 350 U.S. 907, 76 S.Ct. 192, 100 L.Ed. 799 (1955); Air Transport Associates v. United States, 221 F.2d 467 (9th Cir. 1955).

12. United States v. Hunsucker, supra.

13. Dahlstrom v. United States, 228 F.2d 819 (8th Cir. 1956).

lish local flying areas, "insofar as practicable," outside populous areas, control areas, and control zones and to use the least congested airspace within the 100-mile limit, which limit could be extended "when required." Section 5(a) provides that, in the control of simulated instrument flight rule approaches, the commander will direct "maximum use of outlying facilities" in order to relieve air traffic congestion near local navigational facilities. Section 2(b) requires the Commander to "schedule local VFR flight operations in a manner which will minimize congestion and potential air collision hazards." The district court found that it was actionable negligence to design the KRAM procedure in such a fashion that approximately 85% of it took place over and upon Victor 8 airway at altitudes in which en route commercial passenger planes regularly flew.

To argue, as the government does, that the district court merely substituted its judgment for that of Nellis Command as to the proper designation of areas in which various flying activities were to take place, is not entirely responsive to the United's and appellees' contentions. It overlooks the findings of fact made by the district court that (1) "no one at Nellis was assigned to or exercised the responsibility of making such a study [of commercial passenger traffic in the area] or of designing or utilizing the KRAM procedure in light of facts obtainable from such a study" and (2) that Nellis Command made no inquiries of any source concerning the volume, flow, times or altitudes of airline traffic on Victor 8 in the Las Vegas vicinity. Although the government lists these findings of fact among those it feels are unsupported by the evidence, we hold such findings amply supported.

However, the government appears to agree that AFR 55–19 imposed upon the commander of Nellis base the duty of making a factual analysis and survey of the topography and airspace surrounding his flying activity.[14]

We might agree with the government that the discretionary function exception precludes the district court from evaluating the numerous factors bearing upon the problem of flying activity segregation at Nellis base, and from concluding that Nellis Command exercised poor judgment, if Nellis Command had complied with the directions of the Secretary of the Air Force when establishing the KRAM procedure. In our view, the provisions of AFR 55–19 imposed the clear duty upon Nellis Command to design flying procedures in light of facts obtainable from a study of commercial passenger air traffic in the area. The official directions of AFR 55–19 left no room for discretion to bypass this factor when undertaking to establish the KRAM procedure. The failure to make and utilize such a study does not, as a matter of law, constitute negligence, but we hold that the district court's finding of negligence is not repugnant to the discretionary function exception for the reason that such failure had the effect of removing Nellis Command's decision from the realm of discretionary functions.

The government's reliance upon Kirk v. United States, 270 F.2d 110 (9 Cir. 1959) and Builders Corporation of America v. United States, 320 F.2d 425 (9th Cir. 1963), is misplaced. In those cases we held that legal duties on the part of the government were not to be inferred from certain regulations, manuals, directives (Kirk), or from communications (Builders), in circumstanc-

14. In its brief the government states:
"For example, in order for the Commander to perform the duties imposed upon him by the Air Force Secretary's Order, he must, in accordance with said Order, first survey the area for 'populous areas' and 'congested airspace,' and determine 'control areas' and 'control zones.' He must locate 'prominent landmarks.' As a preface to this duty he must familiarize himself with the nature and extent of air traffic 'on civil airways,' 'at nearby airfields,' and 'in local flying areas.' He must locate 'local navigational facilities,' and define 'outlying facilities.'"

es where a legal duty toward the claimants was not otherwise owing. In the instant case, the United States was under a duty to control the operation of its airplanes with due regard for the safety of other users of the airspace. The legal duty of the government toward the passengers aboard United's plane is clear and resort need not be made to AFR 55–19 to discern such duty. It was that duty of care which the district court found had been breached; the breach of the duty imposed upon Nellis Command by AFR 55–19 operates only to remove the applicability of the discretionary function exception to the Tort Claims Act when considering whether the establishment and continued use of the KRAM procedure was made agreeable to the government's duty toward appellees existent under tort law principles.

We turn next to the findings that Nellis Command was negligent in the actual use of the KRAM procedure and in the conduct of operations thereon. The district court's findings in this respect have to do with the failure to secure an IFR clearance or traffic information by or for the jet pilots. Section 5(c) of AFR 55–19 requires, "insofar as practicable," Air Force Traffic Control personnel "who are authorized to do so" to furnish pilots practicing instrument approaches with IFR separation "from other known traffic." There is evidence that Nellis Command did not deem it "practicable" to furnish IFR separation to every instrument-approach training flight. The government contends that the Air Force Traffic Control personnel were not authorized to provide IFR clearances and that Nellis base lacked IFR service capabilities. The district court made no specific finding of fact that Nellis personnel were or were not authorized to provide IFR separation at the time of the collision. The Air Route Traffic Control Center facility of the CAA having jurisdiction of the Nellis-Las Vegas area was at Salt Lake City, Utah. The district court found that if a request for an IFR clearance had been made, via available radio and telephone facilities, by or on behalf of the jet pilots from the CAA, such request would have been processed and clearance for an immediate KRAM procedure would have been denied until United's Flight 736 had passed the area in question. Because of the lack of findings concerning the applicability of Section 5(c) of AFR 55–19 to Nellis base, we will assume, without deciding, that the government is correct that Nellis Command had discretion, within the meaning of the discretionary function exception, not to furnish the F–100F pilots an IFR clearance.

This assumption brings us to the provisions of section 5(d), which section the government insists is here applicable, and section 7(c). Section 5(d) provides:

"Air Force Air Traffic Control Personnel who are not authorized to provide IFR control service *will furnish* traffic information to those pilots practicing instrument approaches and advise them to maintain VFR flight." (Emphasis supplied.) Section 7(c) provides:

"Air traffic control personnel *will furnish* pilots with traffic advisories and other information on local conditions, which will assist them in avoiding collisions during VFR weather conditions." (Emphasis supplied.)

We find no merit in the government's contention that the Secretary of the Air Force intended, in these provisions, the furnishing of information about local military air traffic only but not about commercial air traffic. The record amply supports the several findings that such traffic information was not furnished and that this failure constitutes negligence which was a proximate cause of the collision.

The district court found not only that the government negligently failed to inform the pilots practicing the KRAM procedure of commercial passenger air traffic in the area, but also found the government guilty of negligence in failing to inform United of the details of the KRAM procedure as it was prac-

ticed. There was no contention below, and there is none here, that disclosure of the KRAM procedure to United and other commercial air lines was withheld for security reasons. Negligence in this regard was found below in (1) the failure of Nellis Command to notify United of the facts of the KRAM procedure, the times and methods of its use, and (2) the failure of the CAA to notify United of the existence and utilization of the KRAM procedure prior to authorizing Flight 736 to fly Victor 8 over Las Vegas.

The government construes section 7 of AFR 55–19 as directing Nellis Command to disseminate flight information concerning simulated instrument-approach training, including the KRAM procedure, only to the CAA. There is evidence that information concerning KRAM was disseminated by Nellis Command to the CAA at Las Vegas, Salt Lake City, Los Angeles and the Office of Traffic Control in Washington, D. C. The district court found that the CAA "had knowledge of the utilization of the KRAM procedure." Assuming, but without deciding, the government's assertion that Nellis Command fully disseminated flight information pursuant to AFR 55–19 by notifying the CAA, the focus shifts to the CAA.

The Civil Aeronautics Administration was created along with the Civil Aeronautics Board by the 1940 reorganization of the Civil Aeronautics Authority which had been established by the Civil Aeronautics Act of 1938. A pattern of division of responsibility in air-safety rule making and airspace allocation between civil and governmental aviation had been established under the Air Commerce Act of 1926, and this pattern continued to exist throughout the life of the 1938 Act. At the time of the collision, an organizational need was felt for a unified agency to consolidate certain functions relating to safety common to both civil and military aviation. In response to this need, Congress enacted in August, 1958, the Federal Aviation Act of 1958 and created thereby the Federal Aviation Agency. One of the key purposes of the new act was to improve coordination of military and civil operations in the management of air traffic.[15] Enactment of this legislation occurred three months after the collision here involved. We thus recognize that organizational limitations existed within the government at the time of the collision, although the government does not exaggerate these limitations. We further recognize that an air traffic control system capable of insuring positive separation for all aircraft irrespective of weather conditions, while an ultimate objective of the CAA, was not regarded as feasible under then existing circumstances. But this background renders more conspicuous the methods of communication and coordination between military and civilian aviation which were available at the time of the collision.

■■■ We find no merit in the government's contention that the CAA's omissions fall outside the scope of the Tort Claims Act by virtue of the regulatory nature of that agency. It is well settled that no distinction is to be drawn between sovereign and proprietary functions in determining liability under the Tort Claims Act [16] and that CAA tower operators "merely handle operational details which are outside the area of the discretionary functions and duties referred to in § 2680(a) * * * " [17]

■■ A great many of the cases construing the discretionary function exception have involved the so-called "good Samaritan" doctrine of tort law. The rule is stated in Fair v. United States, 234 F.2d 288 at 294 (5th Cir. 1956):

" * * * if the Government undertakes to perform certain acts or functions thus engendering reliance thereon, it must perform them with

15. 2 U.S.Cong. & Ad.News, p. 3741 et seq. (1958).

16. Air Transport Associates v. United States, supra.

17. Eastern Air Lines v. Union Trust Company, supra, 221 F.2d p. 75.

due care; that obligation of due care extends to the public and the individuals who compose it \* \* \*."

The government contends that the CAA operational personnel were under no legal duty to warn or inform United of the hazards created by the KRAM procedure and that there was no undertaking to do so upon which to predicate application of the good Samaritan rule. We agree that there was no "undertaking" here as obvious say, as the lighthouse in Indian Towing, the fire fighting in Rayonier, the wrecked-ship marking in Somerset Seafood Co., the rescue operations in Lawter and DeVane, or the express assurance involved in Fair. The issuance of the IFR clearance, which appellees point to as such an undertaking, insured separation from other aircraft only from other IFR flights under IFR (low visibility) conditions and from traffic within control zones of airports.[18] The limited scope of IFR clearances was known to United. But it does not follow, as the government urges, that a warning of known hazards which might be encountered is tantamount to positive air control. And we cannot accept the government's assertion that the CAA deliberately adopted the policy of *refusing* to give out information concerning known hazards likely to be encountered by commercial passenger flights in order not to dilute Air Traffic Rules requiring pilot vigilance during flight in VFR conditions. We are directed to no evidence which even suggests that the CAA operated under such a policy and we do not agree that the rule requiring pilot vigilance *"logically* and *necessarily* negated and precluded any and all alternative

rules, practices or customs for the reason that any such alternative would detract from the effectiveness of the rule." (Emphasis in government's brief.)

The policy of the CAA in this regard is contained in the Air Traffic Control Rules, Part 617 of Title 14, C.F.R. 14 C.F.R. § 617.4 provided as follows at the time of the accident:

"The primary objective of the air traffic control service shall be to promote the safe, orderly and expeditious movement of air traffic. This shall include: (a) Preventing collisions between aircraft and between aircraft and obstructions on the movement area. (b) Expediting and maintaining an orderly flow of air traffic. (c) *Assisting the person in command of an aircraft by providing such advice and information as may be useful for the safe and efficient conduct of a flight.* \* \* \*"[19]

Finally, it must be remembered that the obligation of the government was to operate its aircraft with due regard for the safety of others, irrespective of other duties. A warning to others of dangerous flying activity being conducted by the government would have been a precaution dictated by the exercise of ordinary care. We therefore affirm the district court's holding that it was negligence at the operational level of the government to fail to inform United of the details of the government's hazardous activity involved in the KRAM procedure prior to authorizing flight 736 to travel into the area where such activity was likely to be encoun-

---

18. United States v. Schultetus, supra.

19. Other pertinent sections of Part 617 are:

"§ 617.2 *Basis and Purpose.* Section 26.26 of this title provides that a certificated air-traffic control-tower operator shall control traffic in accordance with rules prescribed by the administrator to provide for the safe, orderly and expeditious flow of air traffic. The purpose of this part is to prescribe such rules.

"§ 617.3 *Scope.* The rules contained in this part shall be uniformly applied by all persons controlling air-traffic under authority of an air-traffic control-tower operator's certificate issued by the Civil Aeronautics Administration." Issued under 49 U.S.C. § 425, these rules first appeared April 21, 1951, in 16 Fed. Reg. 3460 and again in 22 Fed.Reg. 9921. See Anno., 86 A.L.R.2d 385, 394–395 (1962).

tered. In view of the direction in AFR 55–19 for Nellis Command to inform the CAA of simulated instrument-approach training, including the KRAM procedure, and in view of the direction in the Air Traffic Control Rule for CAA operational personnel to provide advice and information which may be useful for the safe conduct of a flight, we do not deem this holding to be repugnant to any discretionary policy of the government.

■ The government's reliance upon 28 U.S.C. § 2680(h) relating to exemption from the Tort Claims Act of causes of action predicated upon misrepresentation is misplaced. This section applies to claims arising out of misrepresentation. United States v. Neustadt, 366 U.S. 696, 81 S.Ct. 1294, 6 L.Ed.2d 614 (1960). Here, the gravamen of the action is not misrepresentation but the negligent performance of operational tasks, although such negligence consisted partly of a failure of a duty to warn. Indian Towing, supra; United States v. White, 211 F.2d 79 (9th Cir. 1954); Fair v. United States, supra; United States (Eastern Airlines) v. Union Trust Co. supra.

## INDEMNITY

### Nongovernment Employee Cases

■ The district court's discussion of the indemnity and contribution issues is found in Wiener v. United Air Lines, 216 F.Supp. 701, 705–708. The parties agree that the law applicable to these questions is Nevada law; that Nevada has no statute and there are no Nevada cases pertinent to the facts of this case;

and that Nevada adopts the common law when not in conflict with the Nevada Constitution and statutes or the Constitution and laws of the United States. The common law principles of non-contractual indemnity and contribution among persons jointly liable in tort to a third party are not susceptible of definite and precise articulation. The starting point is the general rule prevailing in the majority of American jurisdictions, said to derive from Merryweather v. Nixon, 8 Term. Rep. (Kings Bench 1799), that courts will refuse contribution or indemnity between concurrently negligent tortfeasors.[20] In order to effect equity and justice in certain circumstances the rule has been relaxed to permit exceptions, but the cases relaxing the rule cannot be entirely harmonized or reconciled.

■ A distinction exists between contribution and indemnity: in the former the parties liable for the tort are said to be in pari delicto and the damages are equally divided; in the latter the parties are not in pari delicto and the entire burden is placed upon one of them.[21] Contribution is a minority rule and exists usually by virtue of statutes rather than case law.[22] On the other hand, "[w]ith respect to indemnity in favor of a person who has been compelled to pay for another's wrong, the general rule against indemnity is more thoroughly circumscribed with exceptions than is the case with contribution." [23]

■ The doctrinal basis for noncontractual indemnity among tort-feasors is unjust enrichment.[24] The right is

---

20. Prosser, Torts, pp. 246 et seq. (2d Ed. 1955); Leflar, Contribution and Indemnity Between Tortfeasors, 81 U.Pa.L. Rev. 130 (1932); Davis, Indemnity Between Negligent Tortfeasors; a proposed Rationale, 37 Iowa L.Rev. 517 (1952).

21. Prosser, supra, 249; Davis, supra, 517.

22. Davis supra. It is to be noted here that the District of Columbia has joined the few jurisdictions where contribution is allowed at common law. George's Radio v. Capital Transit Co., 75 U.S.App. D.C. 187, 126 F.2d 219 (1942), and that

jurisdiction tends to regard contribution as the exclusive remedy between concurrently negligent tortfeasors. See Warner v. Capital Transit Company, 162 F.Supp. 253 (D.C.D.C. 1958); D. C. Transit System, Inc. v. Slingland, 105 U.S.App.D.C. 264, 266 F.2d 465, 72 A.L.R.2d 1290 (1959), cert. den. 361 U.S. 819, 80 S.Ct. 62, 4 L.Ed.2d 64 (1959).

23. Anno. 88 A.L.R.2d 1355, 1356; See Prosser, supra, 249–250.

24. Leflar, supra, 146–147.

"restitutional in nature, and is based on inherent injustice." [25] There is general agreement that indemnity is permitted where the indemnitee has only an imputed or vicarious liability because of a special relationship with the actual wrongdoer but is not personally at fault; [26] where the indemnitee has incurred liability by performing at the direction of the indemnitor an act not manifestly wrong; [27] where the indemnitor has the duty to maintain safe premises, defects in which the indemnitee has failed to correct or discover; [28] or where the indemnitor is a supplier of goods. [29] There are, however, numerous cases permitting indemnity under circumstances which do not fit neatly into the above categories

These cases frequently characterize the negligence of the indemnitor as "active," "primary," or "positive" and the negligence of the indemnitee as "passive," "secondary," or "negative." Such characterizations have been criticized as being artificial, lacking objective criteria desirable for predictability in the law, [30] and various rationales have been proposed for allowance of indemnity in such cases. Thus, indemnification of a concurrently negligent tortfeasor is said to be based upon a disparity of duties of care owed by the tortfeasors to the injured party, [31] the doctrine of last clear chance or discovered peril, [32] a disparity of gravity of the fault of the tortfeasors, [33] or a combination of these. [34]

Most often cited as enunciating the exception urged upon us by United to the rule against indemnity are the following cases. In *Washington Gaslight Co. v. Dist. of Columbia, 161 U.S. 316*

(1895) the court said, at 327–328, 16 S.Ct. 564, at 568, 40 L.Ed. 712:

"In the leading case of Lowell v. Boston & L. R. Corp., 23 Pick. 24, 32, 34 Am.Dec. 33, the doctrine was thus stated:

" 'Our law, however, does not in every case disallow an action by one wrongdoer against another to recover damages incurred in consequence of their joint offense. The rule is, *"In pari delicto, potior est conditio defendentis."* If the parties are not equally criminal, the principal delinquent may be held responsible to his codelinquent for damages incurred by their joint offense. In respect to offenses in which is involved any moral delinquency or turpitude, all parties are deemed equally guilty, and courts will not inquire into their relative guilt. But where the offense is merely *malum prohibitum*, and is in no respect immoral, it is not against the policy of the law to inquire into the relative delinquency of the parties, and to administer justice between them, although both parties are wrongdoers.'

"In [City of] Brooklyn v. Brooklyn City R. Co., 47 N.Y. 475 [7 Am. Rep. 469], the same rule was applied, the court saying (page 487): 'Where the parties are not equally criminal, the principal delinquent may be held responsible to a codelinquent for damage paid by reason of the offense in which both were concerned, in different degrees, as perpetrators.' All the cases referred to involved only the right of a municipal corporation to recover over

---

25. Davis, supra, 538.

26. Prosser, supra, 250; Davis, supra, 519; Leflar, supra, 148; 88 A.L.R.2d 1355.

27. 88 A.L.R.2d at 1356; Prosser, supra, 250; Leflar, supra, 150; Davis, supra, 528.

28. Prosser, supra, 250; 88 A.L.R.2d at 1357; Davis, supra, 526.

29. Prosser, supra, 250; 88 A.L.R.2d at 1357; Davis, supra, 526.

30. E. g. Leflar, supra, 156; Davis, supra, 539.

31. Davis, supra, 546–553.

32. Leflar, supra, 151–154.

33. Slattery v. Marra Bros., 186 F.2d 134 (2d Cir. 1951), cert. den. 341 U.S. 915, 71 S.Ct. 736, 95 L.Ed. 1351 (1951).

34. E. g. Prosser, supra, 251; 88 A.L.R.2d at 1357.

the amount of the damages for which it had been held liable in consequence of a defective street, occasioned by the neglect or failure of another to perform his legal duty. The rule, however, is not predicated on the peculiar or exceptional rights of municipal corporations. It is general in its nature."

In Union Stock Yards Co. of Omaha v. Chicago, B. & Q. R. Co., 196 U.S. 217, 25 S.Ct. 226, 49 L.Ed. 453 (1905), indemnity was refused under the facts of the case for the reason that "the negligence of the parties has been of the same character." The court recognized the rule allowing indemnity and stated it as follows, 196 U.S. p. 225, 25 S.Ct. p. 228:

" * * * notwithstanding the negligence of one, for which he has been held to respond, he may recover against the principal delinquent where the offense did not involve moral turpitude, in which case there could be no recovery, but was merely *malum prohibitum,* and the law [will] inquire into the real delinquency of the parties, and place the ultimate liability upon him whose fault had been the primary cause of the injury."

The court has applied the foregoing principles in cases where the applicable state law expressly recognized them. Snohomish County v. Great Northern Ry., 130 F.2d 996 (9th Cir. 1942); Booth-Kelly Lumber Co. v. Southern Pacific Co., 183 F.2d 902, 20 A.L.R.2d 695 (9th Cir. 1950). In the latter case we characterized the principles of the Washington Gaslight and Union Stock Yards cases as "well-known common law rules." 183 F.2d at 910.

United States v. Savage Truck Line, Inc., 209 F.2d 442, 44 A.L.R.2d 984 (4th Cir. 1953), cert. den. 347 U S. 952, 74 S. Ct. 677, 98 L.Ed. 1098 (1954), involved a common carrier transporting airplane engines under contract with the United States which had been improperly loaded by the United States, as shipper, and which fell off the Savage truck upon another truck, killing the driver thereof. Savage had actual knowledge of the improper loading. Suit was filed by the decedent's representative against the government and Savage, and the government cross-complained against Savage for indemnity. The district court held the wrongdoers *in pari delicto* and awarded contribution between them. The circuit court modified the judgment by awarding indemnity in favor of the United States. That court said, 209 F.2d 446–447:

"In the infinite variety of circumstances where indemnity has been sought the courts have used various terms to distinguish between the grade of fault attributable to the participating wrongdoers so as to justify the imposition of the entire loss on the one who is regarded as the principal offender. The acts of the parties are variously contrasted as positive or negative, as in some of the cases last cited, and as active and passive in others; see Gray v. Boston Gas Light, 114 Mass. 149; or as primary and secondary, see American Dist. Tel. Co. v. Kittleson, 8 Cir., 179 F.2d 946; Fidelity & Casualty Co. [of New York] v. Federal Express, Inc., 6 Cir., 99 F.2d 681; and sometimes one party is said to have been merely constructively liable and therefore entitled to indemnity from the actual wrongdoer. Oats v. Dublin Nat. Bank, 127 Tex. 2, 90 S.W.2d 824; 27 Am.Jur., Indemnity, § 18.

"Sometimes the principal fault is attributable to the party who performed the last act which resulted in the damage and without which it would not have occurred, that is, to the party who had the last clear chance to avoid the accident. Nashua Iron & Steel Co. v. Worchester & Nashua R. Co., 62 N.H. 159; City of Tacoma v. Bonnell, 65 Wash. 505, 118 P. 642, 36 L.R.A., N.S., 582, 583; Doles v. Seaboard Airline [R.] Co., 160 N.C. 318, 75 S.E. 722, 42 L.R.A.,N.S., 67.

"Whatever the terminology, the inquiry is always whether the difference in the gravity of the faults of the participants is so great as to throw the whole loss upon one. In such event there is contribution in the extreme form of indemnity. See Slattery v. Marra Bros., Inc., 2 Cir., 186 F.2d 134."

The following quotation from Security Insurance Co. of New Haven v. Johnson, 276 F.2d 182, 185 (10th Cir. 1954), states the legal principles here being considered about as well as they can be stated:

"The general rule is that, in the absence of express contract, there is no contribution between joint tortfeasors. But where they are not *in pari delicto,* and their negligence is substantially different not merely in degree but in character, it is generally recognized that indemnity may be awarded. Washington Gaslight Co. v. District of Columbia, 161 U.S. 316, 16 S.Ct. 564, 40 L.Ed. 712; United States v. Acord, 10 Cir., 1954, 209 F.2d 709, certiorari denied 347 U.S. 975, 74 S.Ct. 786, 98 L.Ed. 1115; Peak Drilling Co. v. Halliburton Oil Well Cement [Cementing] Co., 10 Cir., 1954, 215 F. 2d 368; Thomas v. Malco Refineries, Inc., 10 Cir., 1954, 214 F.2d 884; Lee Way Motor Freight v. Yellow Transit Fr. Lines, 10 Cir., 1957, 251 F.2d 97.

"Concentration in the arguments on the active-passive idea must not becloud the more fundamental basis of the doctrine which, as demonstrated by the authorities cited above, has been found to have application also by reason of otherwise described differences turning upon primary and secondary liability, actual fault as distinguished from that which is imputed or constructive, knowledge or lack of knowl-

edge, or the nature of the respective duties to the person injured or between the parties charged.[1] As historically traced by the Supreme Court in the Washington Gaslight Co. case, such distinctions had their roots in concepts of relative delinquency or culpability. The fundamental limitation as applied by this court in United States v. Acord, supra, is that the character of the negligence must be essentially different; and, of course, indemnification must be rationally justified upon equitable considerations." (Footnote omitted.)

 The foregoing cases occupy a place in the common law to which Nevada's court of last resort could and would properly turn for guidance. We do not deem the circumstances that the indemnity question here arises in the context of a wrongful death action to be so significant as would lead Nevada's court irresistibly to the indemnity and contribution concepts developed in the District of Columbia, as did the district court.[35] The right of indemnity, where it exists, may be enforced against the United States under the Tort Claims Act. United States v. Yellow Cab Co., 340 U.S. 543, 71 S.Ct. 399, 95 L.Ed. 523 (1951); St. Louis-San Francisco Ry. Co. v. United States, 187 F.2d 925 (5th Cir. 1951); United States v. Acord, 209 F.2d 709 (10th Cir. 1954), cert. den. 347 U.S. 975, 74 S.Ct. 786, 98 L.Ed. 1115 (1954).

 The district court's denial of United's claim for indemnity was based in part upon the view that Nevada law would not permit it and partly upon its findings to the effect that United and the government were *in pari delicto.* In our view, such expressions as "active" and "passive" negligence, and related expressions, are but legal conclusions or inferences, drawn from all of the facts and circumstances of a particular case,

35. Note the analyses employed by the courts in Security Insurance Co. of New Haven v. Johnson, supra, and Great

Northern Railway Company v. United States, 187 F.Supp. 690 (D.Mont.1960).

representing the differences of various sorts in the contrasted characters of negligence which warrant indemnity upon equitable considerations. In these circumstances, we are not bound by limitations of Rule 52(a).

■ United's duty to appellees' decedents was to exercise the highest degree of care; the government's duty was to exercise ordinary care. The government's negligent acts occurred literally from the start to the finish of this tragic incident. The cumulative effect of these negligent acts was to dispatch United's flight 736 and the government's high-speed jet training mission, conducted by a student pilot who was virtually blindfolded and an instructor whose cockpit preoccupations were greater than ordinarily demanded of pilots flying under VFR conditions and responsibilities, into the same area without warning to those in control of either craft. If we accept the government's assertions, the government's pilots discovered United's peril in time to effectively respond but engaged in a maneuver destined to encounter rather than to evade. Contrasted with all of this is the finding that United's pilots, to some disputed degree of probability, could have seen the jet and, in discharge of the obligation to exercise the highest degree of care for their passengers, should have seen and avoided the jet.[36] In view of the disparity of duties, the clear disparity of culpability, the likely operation of the last clear chance doctrine and all the surrounding circumstances, the findings that United and the government were *in pari delicto* are clearly erroneous and we hold that there is such difference in the contrasted character of fault as to warrant indemnity in favor of United in the nongovernment employee cases.

*Government employee cases*

The nine government employee cases involve seven non-military employees and two members of the Armed Forces. In the non-military government employee cases, the government raises two defenses to United's claim for indemnity based upon Section 7(b) of the Federal Employees' Compensation Act [5 U.S.C. § 757(b).] [37]

■ First, it argues that the language of the statutes expressly bars suit against it by United for indemnity since United falls within the provision " * * anyone otherwise entitled to recover damages from the United States or such instrumentality, on account of such injury or death * * * " Second, it argues that by operation of the exclusive liability provision of this section there is no underlying tort liability of the government to its employees and therefore there is no basis for indemnification. In our view United's claim for indemnity is not expressly barred by the provision of the section relied upon by the government, but is barred in accordance with the government's second contention.

■ The Supreme Court in Weyerhaeuser S.S. Co. v. United States, 372

36. Although the district court found that United should have had knowledge of the details of flying activities on and across Victor 8, including knowledge of the KRAM procedure, it is generally agreed, as pointed out above, that the failure to discover unsafe conditions created by a joint tortfeasor constitutes "passive" negligence and does not bar indemnity.

37. Sec. 7(b) of the Federal Employees' Compensation Act [5 U.S.C. § 757(b)]: "The liability of the United States or any of its instrumentalities under sections 751–756, 757–791, and 793 of this title or any extension thereof with respect to the injury or death of an employee shall be exclusive, and in place, of all other liability of the United States or such instrumentality to the employee, his legal representative, spouse, dependents, next of kin, and anyone otherwise entitled to recover damages from the United States or such instrumentality, on account of such injury or death, in any direct judicial proceedings in a civil action or in admiralty, or by proceedings, whether administrative or judicial, under any other workmen's compensation law or under any Federal tort liability statute: *Provided, however*, That this subsection shall not apply to a master or a member of the crew of any vessel."

U.S. 597, 83 S.Ct. 926, 10 L.Ed.2d 1 (1963), held that the express provisions of the statute do ·not qualify the historic admiralty rule of divided damages in mutual fault collisions. The admiralty rule of divided damages is to be distinguished from the rule of indemnity urged upon us by United since under admiralty law there arises from a collision involving mutual fault the right to apportionment of all damages resulting therefrom, including personal injuries, cargo damage, and damage to the ships.[38] The divided damage rule is based upon the duty which each shipowner owes the other to navigate safely irrespective of any duty to the person injured. On the other hand neither contribution nor indemnity may be awarded without the support of liability on the part of the indemnitor to the person injured. The courts have consistently held that in the absence of an express or implied contract of indemnity, or in the absence of the indemnitor's liability to the injured party, there can be no recovery for indemnity. Christie v. Powder Power Tool Corp., 124 F.Supp. 693 (D.D.C. 1954); Terminal R. Ass'n of St. Louis v. United States, 182 F.2d 149 (8th Cir. 1950), cert. den. 340 U.S. 825, 71 S.Ct. 60, 95 L.Ed. 606; Slattery v. Marra Bros., supra; Lo Bue v. United States, 188 F.2d 800 (2nd Cir. 1951); Drumgoole v. Virginia Electric & Power Co., 170 F.Supp. 824 (E.D.Va.1959).

█ As pointed out in the Weyerhaeuser opinion 372 U.S. 602, 83 S.Ct. 926, the exclusive liability provision of the Federal Employees' Compensation Act is indistinguishable from Section 5 of the Longshoremen's and Harbor Worker's Act, 33 U.S.C. § 905.[39] In construing this statute· the courts have held that an employer may be liable for indemnity to another on the basis of an express or implied contract of indemnity but that in the absence of a contractual duty, the exclusive liability provision removed the underlying liability necessary for indemnity. American Mutual Liability Insurance Co. v. Matthews, 182 F. 2d 322 (2nd Cir. 1951); Lo Bue v. United States, supra; Crawford v. Pope & Talbot, 206 F.2d 784 (3rd Cir. 1953); Brown v. American-Hawaiian S.S. Co., 211 F.2d 16 (3rd Cir. 1954). The court said in Crawford v. Pope & Talbot, supra, 206 F.2d at 792:

> "Authority is lacking 'for saying that differences in the degrees of fault [active or passive negligence] between two tortfeasors will without more strip one of them, if he is an employer, of the protection of a compensation act; and we are at a loss to see any tenable principle which can support such a result.' Slattery v. Marra Bros., 2 Cir., 1951, 186 F.2d 134, 139."

The 3rd Circuit emphasized these views in the Brown case at page 18 of 211 F. 2d:

> "Appellant suggests that irrespective of the contractual relations between third-party plaintiff (owner) and third-party defendant (employer) in this type of suit, a right of indemnity exists where the liability of the former is secondary or passive while that of the latter is primary or active. Such a problem would be posed, for example, where the owner is held liable to a plaintiff-employee for a condition of unseaworthiness created by the employer's negligence and there is no contract, express or implied, between them,[4] or, if such contract exists, it cannot be read to lay the groundwork for an indemnification claim. In answer to this suggestion we repeat what we thought had been made clear by the Crawford case:

38. E. g. 48 Am.Jur., Shipping § 241 ·(1943).

39. "The liability of an employer prescribed in section 904 of this title shall be exclusive and in place of all other liability of such employer to the employee, his legal representative, husband or wife, parents, dependents, next of kin, and anyone otherwise entitled to recover damages from such employer at law or in admiral· ty on account of such injury or death."

there can be no action of indemnity in these cases which is not based on the violation of some contractual duty.[5] (Footnotes omitted.)"

The court in Weyerhaeuser, supra, said at 602–603 of 372 U.S., at 929, 930, of 83 S.Ct.:

"In Ryan Stevedoring Co. v. Pan-Atlantic S.S. Corp., 350 U.S. 124, [76 S.Ct. 232, 100 L.Ed. 133] it was held that despite this exclusive liability provision, a shipowner was entitled to reimbursement from a longshoreman's employer for damages recovered against the shipowner by the longshoreman injured by the employer's negligence. The Court's decision in Ryan was based upon the existence of a contractual relationship between the shipowner and the employer. In a series of subsequent cases, the same result was reached, although the contractual relationship was considerably more attenuated. * * *

"In the present case there was no contractual relationship between the United States and the petitioner, governing their correlative rights and duties. There is involved here, instead, a rule of admiralty law which, for more than 100 years, has governed with at least equal clarity the correlative rights and duties of two shipowners whose vessels have been involved in a collision in which both were at fault. * * * Long ago this Court held that the full scope of the divided damages rule must prevail over a statutory provision which, like the one involved in the present case, limited the liability of one of the shipowners with respect to an element of damages incurred by the other in a mutual fault collision. The Chattahoochee, 173 U.S. 540 [19 S.Ct. 491, 43 L.Ed. 801]."

 United's claim for indemnity is not based upon a duty owed by the government to United by virtue of a contract, attenuated or otherwise, or by operation of a rule of law such as the divided damage rule of admiralty. There being no underlying liability on the part of the government, United's claim for indemnity must fall. We do not agree with United that the Supreme Court's remand in the case of Treadwell Construction Co. v. United States, 372 U.S. 772, 83 S.Ct. 1102, 10 L.Ed.2d 136 (1963) [per curiam], represents a rejection by the court of these well-settled principles.

 With respect to the two servicemen cases, United's claim for indemnity must fall for the reason that the government is not liable under the Federal Tort Claims Act for injuries to servicemen where injuries arise out of or are in the course of activity incident to service. Feres v. United States, 340 U.S. 135, 71 S.Ct. 153, 95 L.Ed. 152 (1950); see Indian Towing, supra, 350 U.S. at 69, 76 S.Ct. 122. We therefore affirm the District Court's denial of United's claim for indemnity in the nine government employee cases.

### SUMMARY JUDGMENTS

We turn next to United's appeal from the summary judgments rendered in the Nevada cases. As was pointed out above, the Nevada cases were transferred to the lower court for trial of the damage issues after plaintiffs' motions for summary judgments on the issues of liability had been granted by the District Court for the District of Nevada on the ground that United was collaterally estopped by virtue of the judgments in the Wiener cases to deny liability to the plaintiffs. United assigns as error the Nevada District Court's interpretation and application of the law of res judicata as regards the scope of the doctrine of collateral estoppel and of the doctrine of finality of judgments. The district court's well considered opinion on these points is reported in United States v. United Air Lines, Inc., 216 F.Supp. 709, 718–732 (D.Nev.1962). We affirm and adopt herein as our own the district court's treatment of the issue of mutuality of collateral estoppel, 216 F.Supp. at 725–729.

United's contentions concerning the finality question stem from the circumstance that there was pending an appeal from the Wiener judgments at the time the Nevada district court applied *res judicata,* and from the California rule that California State court judgments cannot have a *res judicata* effect during the pendency of an appeal. Since the Wiener judgments are herein affirmed, it would be an idle gesture to reverse the summary judgment in the Nevada cases with directions to the district court to enter the same judgment on the basis of the *res judicata* effect of the affirmed judgments.[40] We therefore affirm the summary judgments.

## INCREASE OF JURY'S DAMAGE AWARDS

United specifies as error that in two of the Nevada cases (Nollenberger and Matlock) the district court committed error in increasing the general verdict and thereby deprived United of its right to jury trial. After the cases were transferred from the Nevada district court to the court below, a jury was impaneled to try the issue of damages, which jury was different from the one which tried the Wiener actions. In five of the cases (the parties having stipulated to the amount of judgment in two), the jury conducted separate deliberations upon the evidence and instructions submitted in each case. In each of these cases the district court submitted, over United's objections, twelve interrogatories to the jury. The court acted pursuant to the provisions of Fed.R.Civ.P. 49(b),[41] viewing the first eleven interrogatories as calling for special findings and the twelfth as calling for a general verdict. In four of the cases thus submitted, the plaintiffs moved for a new trial on the following grounds:

(1) insufficiency of the evidence to justify the judgment;

(2) inadequate damages contrary to the evidence;

(3) inconsistency of the general verdict with the special findings;

and further moved for relief in the alternative, on the third ground, for submission of additional interrogatories to the jury or for calculation by the court of general damages from the answers to the special interrogatories. In the Nollenberger and Matlock cases, the court ruled (1) that the answers to the special interrogatories were consistent with each other, were supported by the evidence, but were inconsistent with the general verdicts; (2) that Rule 49(b) did not permit the submission of additional interrogatories after the jury returned its verdict answering special interrogatories and at the same time returned a general verdict; and (3) "[T]hat before granting a new trial, it is the duty of the Court to make calculations from the special interrogatories, and enter a judgment thereon." The court then made calculations from the special interrogatories in the Nollenberger and Matlock

---

40. Guaranty Underwriters v. Johnson, 133 F.2d 54 (5th Cir. 1943). See Hahn v. Padre, 235 F.2d 356 (9th Cir. 1956).

41. "(b) *General Verdict Accompanied by Answer to Interrogatories.* The court may submit to the jury, together with appropriate forms for a general verdict, written interrogatories upon one or more issues of fact the decision of which is necessary to a verdict. The court shall give such explanation or instruction as may be necessary to enable the jury both to make answers to the interrogatories and to render a general verdict, and the court shall direct the jury both to make written answers and to render a general verdict. When the general verdict and the answers are harmonious, the court shall direct the entry of the appropriate judgment upon the verdict and answers. When the answers are consistent with each other but one or more is inconsistent with the general verdict, the court may direct the entry of judgment in accordance with the answers, notwithstanding the general verdict or may return the jury for further consideration of its answers and verdict or may order a new trial. When the answers are inconsistent with each other and one or more is likewise inconsistent with the general verdict, the court shall not direct the entry of judgment but may return the jury for further consideration of its answers and verdict or may order a new trial."

cases and entered judgments which increased the jury's general damage awards, respectively, by $57,047 and $49,451. The court also made similar calculations in the other two cases but arrived at "substantially the same figure as the total sum in damages found by the Jury" and entered judgments therein for the amounts found by the jury.

The district court's analysis of the foregoing procedure, the text of the interrogatories and answers thereto, and the details of the court's calculations are set forth in Nollenberger v. United Air Lines, Inc., 216 F.Supp. 734 (S.D.Cal. 1963). For simplification, reference is hereby made thereto.

If the jury had merely returned a general verdict of a lump sum award in the two cases under consideration which the district court then increased, United would have been deprived of the jury trial guarantee of the Seventh Amendment. Dimick v. Schiedt, 293 U.S. 474, 55 S.Ct. 296, 79 L.Ed. 603 (1934). Strictly speaking, additur is not involved here since United's consent to the increase was neither requested nor given. A fortiorari, however, the principles announced in Dimick have pertinence here. See De Pinto v. Provident Security Life Insurance Company, 323 F.2d 826 (9th Cir. 1963), cert. den. 376 U.S. 950, 84 S.Ct. 969, 11 L.Ed.2d 970 (1964). In Dimick it is said, at 485, 486–487 of 293 U.S., at 300, 301 of 55 S.Ct.:

> " * * * [T]his court in a very special sense is charged with the duty of construing and upholding the Constitution; and, in the discharge of that important duty, it ever must be alert to see that a doubtful precedent be not extended by mere analogy to a different case if the result will be to weaken or subvert what it conceives to be a principle of the fundamental law of the land.
>
> * * * * * *
>
> "Where the verdict returned by a jury is palpably and grossly inadequate or excessive, it should not be permitted to stand; but, in that

event, both parties remain entitled, as they were entitled in the first instance, to have a jury properly determine the question of liability and the extent of the injury by an assessment of damages. Both are questions of fact. * * * But, where the verdict is too small, an increase by the court is a bald addition of something which in no sense can be said to be included in the verdict. When, therefore, the trial court here found that the damages awarded by the jury were so inadequate as to entitle plaintiff to a new trial, how can it be held, with any semblance of reason, that the court, with the consent of the defendant only, may, by assessing an additional amount of damages, bring the constitutional right of the plaintiff to a jury trial to an end in respect of a matter of fact which no jury has ever passed upon either explicitly or by implication? To so hold is obviously to compel the plaintiff to forego his constitutional right to the verdict of a jury and accept 'an assessment partly made by a jury which has acted improperly, and partly by a tribunal which has no power to assess.' "

The district court was of the view, presently urged upon us by appellees, that the court's utilization of Rule 49(b) cured all possible constitutional infirmities in its increase of the jury's damage awards. The constitutionality of the district court's action is said to rest in Walker v. New Mexico & S. P. R. Co., 165 U.S. 593, 17 S.Ct. 421, 41 L.Ed. 837 (1897). In question there was a statute of the New Mexico territorial legislature authorizing special findings of fact and providing for judgment on the special findings, if inconsistent with the general verdict. The court said, 165 U.S. 596, 598, 17 S.Ct. 422, 423:

> "The question is whether this act of the territorial legislature in substance impairs the right of trial by jury. The seventh amendment, indeed, does not attempt to regulate

matters of pleading or practice, or to determine in what way issues shall be framed by which questions of fact are to be submitted to a jury. Its aim is not to preserve mere matters of form and procedure, but substance of right. This requires that questions of fact in common-law actions shall be settled by a jury, and that the court shall not assume, directly or indirectly, to take from the jury or to itself such prerogative. So long as this substance of right is preserved, the procedure by which this result shall be reached is wholly within the discretion of the legislature, and the courts may not set aside any legislative provision in this respect because the form of action—the mere manner in which questions are submitted—is different from that which obtained at the common law.

\* \* \* \* \* \*

"We are clearly of opinion that this territorial statute does not infringe any constitutional provision, and that it is within the power of the legislature of a territory to provide that on a trial of a common-law action the court may, in addition to the general verdict, require specific answers to special interrogatories; and, when a conflict is found between the two, render such judgment as the answers to the special questions compel."

▆▆▆▆▆ The teachings of the Dimick and Walker cases seem to us to include the following: an increase by a court of the jury's assessment of damages which is a bald addition of something which in no sense can be said to be included in the verdict is violative of the Seventh Amendment; the rule that special findings prevail over a general verdict must be carefully applied so as not to invade the province of the jury; no such invasion occurs where the special findings are in conflict with the general verdict and where the special findings compel the judgment rendered thereupon. The Supreme Court

has reinforced these principles by well settled corollaries.

"[I]t is the duty of the courts to attempt to harmonize the answers, if it is possible under a fair reading of them: 'Where there is a view of the case that makes the jury's answers to special interrogatories consistent, they must be resolved that way.' Atlantic & Gulf Stevedores, Inc., v. Ellerman Lines, Ltd., 369 U.S. 355, 364 [82 S.Ct. 780, 786, 7 L.Ed.2d 798]." Gallick v. Baltimore & Ohio R. R. Co., 372 U.S. 108, at 119, 83 S.Ct. 659, at 666, 9 L.Ed.2d 618 (1963).

Answers to special interrogatories do not present a square conflict with the general verdict where such answers do not exhaust all of the possible grounds on which the finding implicit in the general verdict may have been based. Arnold v. Panhandle & Santa Fe Ry. Co., 353 U.S. 360, 361, 77 S.Ct. 840, 1 L.Ed.2d 889 (1956).

Applying the foregoing principles to the instant cases, we conclude that the answers to the special interrogatories did not compel the judgment entered by the district court thereupon and that such answers do not present a square conflict with the general verdict for the reason that they do not exhaust all of the possible grounds on which the lump sum damage award of the jury may have been based.

The district court stated that after repeated efforts, by mathematical calculation, to harmonize and reconcile the answers to the eleven special interrogatories with the general verdict, no harmony resulted. This may be so. But nothing in the law compelled the jury to calculate its damage awards according to a fixed mathematical formula using only the factors contained in the eleven special findings. Section 41.090 of the Revised Statutes of Nevada, as in effect on April 21, 1958, and relating to wrongful death actions, provided in pertinent part as follows:

"The court or jury, as the case may be, in every such action may

give such damages, pecuniary and exemplary, as shall be deemed fair and just. Every person entitled to maintain such action, and every person for whose benefit such action is brought, may prove his respective damages, and the court or jury may award such person that amount of damages to which it considers such person entitled."

That the jury was permitted to compute damages according to a mathematical formula is not challenged. That the jury was permitted to award damages solely upon the basis of the factors contained in the answers to the eleven special interrogatories, after due consideration and evaluation of other circumstances, is not challenged. What is challenged is the premise indulged by the district court and the appellees that the jury was not permitted to award damages except upon the results flowing solely from the answers to the eleven special interrogatories. The many cases cited by appellees do not establish that premise.[42]

The jury was admonished to award damages in accordance with all the instructions of the court. No party specifies as error the giving of any of the instructions set forth in the margin.[43]

42. Porter v. Funkhouser, Nev., 382 P.2d 216; Estate of Riccomi, 185 Cal. 458, 197 P. 97, 14 A.L.R. 509 (1921); Bond v. United Railroads of San Francisco, 159 Cal. 270, 113 P. 366, 48 L.R.A., N.S., 687 (1911); Foerster v. Direito, 75 Cal. App.2d 323, 170 P.2d 986, 989 (1946); Ure v. Maggio Bros. Co., Inc., 24 Cal. App.2d 490, 75 P.2d 534 (1938); Rocca v. Tuolumne County Electric, etc., Co., 76 Cal.App. 569, 245 P. 468 (1926); Brown v. Boehm, 78 Cal.App.2d 595, 178 P.2d 49 (1947); O'Toole v. United States, 242 F. 2d 308 (3d Cir. 1957). The parties agree that principles laid down in California cases may appropriately be referred to as bespeaking the equivalent of Nevada law in the field under discussion.

43. "Each of the several cases of course are submitted to you separately on the question, that is, the sum of dollars which the United Air Lines must pay to the plaintiffs in each case in one aggregate sum for their damages resulting from the death of the decedent involved in this case.

"In each case, and in this case, you are called upon to fix an amount of damages to the plaintiffs in your verdict *which is fair and just, regardless of the amount*, and in so doing you must not consider how or in what manner the sum will be paid, or by whom it will be paid, or whether defendant might or might not appeal the case, because these are not matters which should concern you in fixing a total lump sum for which plaintiffs were damaged by the death of the person involved in this case, * * * It is your sole duty to apply the law and consider the evidence as to damages sustained by the plaintiffs as contained in these instructions.

 * * * * *

"You should award the plaintiffs herein such sum as, *under all of the circumstances of the case, may be fair and just compensation* for the pecuniary loss which the [widow and child(ren)] have suffered by reason of the death of [decedent].

"In determining that pecuniary loss, you may consider not only the financial support, if any, which each plaintiff would have received from the deceased except for his death, but also the pecuniary value of the right to receive support, if any, *and the pecuniary value of the society, comfort, care, and protection*, other than the loss of consortium between husband and wife, which each plaintiff has lost by reason of the death.

"In weighing these matters, you may consider the age of the deceased and of each plaintiff; the state of health and the physical condition of the deceased and of each plaintiff as it existed at the time of the death and immediately prior thereto; their station in life; their respective expectancies of life as shown by the evidence; *the disposition of the deceased, whether it was kindly, affectionate or otherwise; whether or not he showed an inclination to contribute to the support of the plaintiffs or any of them;* the earning capacity of the deceased; and *such other facts shown by the evidence as throw light upon the pecuniary value of the support, society, care, comfort and protection* other than the loss of consortium between husband and wife, which the plaintiffs reasonably might have expected to receive from the deceased had he lived.

 * * * * *

"Any judgment in favor of the plaintiffs should be in one lump sum, taking into consideration *all of the factors* which

We will not speculate as to the weight, if any, accorded by the jury to one or more of the italicized factors appearing in such instructions. Suffice it to say that the answers to the eleven special interrogatories do not exhaust all of the factors of damage included within the instructions, and therefore no square conflict exists between the answers and the general verdict. We are not called upon to consider either whether the jury should not have been permitted to consider one or more of the italicized factors or whether the damage awards manifest such passion or prejudice as would render them inadequate. We hold that the court's utilization of the provisions of Rule 49(b) did not render proper its increase of damages in accordance with mathematical computations based upon the special findings.[44]

We recognize that special interrogatories have been properly submitted to juries as to damage issues and that judgments have been properly entered in accordance therewith. But the cases cited by the district court and by appellees here in which the jury's damage award was increased are distinguishable in that either the special findings clearly compelled the increase because the applicable law contemplated a definite and certain measure of damages,[45] or the general verdict contained a patent arithmetical error.[46] No case is cited to us in which a trial court has increased a general verdict in a wrongful death case on the assumption that the jury should have given conclusive effect to less than all the factors which it was entitled to consider in arriving at a just and fair verdict.

IT IS ORDERED:

1. That the judgments entered in favor of the passengers' representatives in the 24 Wiener cases are affirmed;

2. That the judgments entered in the 22 nongovernment employee cases are modified so as to provide an award of indemnity to United Air Lines from the government in each of said cases;

3. That the dismissals of United's claims for indemnity in the 9 government employee cases are affirmed;

4. That the summary judgments entered in the Nevada cases against United on the issues of liability are affirmed;

5. That the judgments entered in favor of the passengers' representatives in the Nevada cases, with the exception of Nollenberger and Matlock, are affirmed;

6. That the judgments in Nollenberger and Matlock are vacated and those cases will be remanded to the district court for the purpose of permitting renewed motions for new trials on the issues of damages unless appellees in Nollenberger and Matlock notify this court in writing within 20 days after the filing

---

have heretofore been mentioned in these instructions." (Emphasis added.)

44. Further error was committed when the court included in its calculations interest on annual earnings, compounded annually at 4%, from one year after death to date of trial. Nothing in Nevada law suggests the propriety of pre-judgment interest, and this factor was never submitted to the jury.

45. Hudson Rug Refinishing & C. Corp. v. Prime Mfg. Co., 115 F.2d 615 (7th Cir. 1940) [element of damage stipulated to by the parties]; Shaffer v. Great American Indemnity Co., 147 F.2d 981 (5th Cir. 1945) [weekly wages under workmen's compensation law]; United States v. City of Jacksonville, Arkansas, 257 F. 2d 330 (8th Cir. 1958) [proper measure of damages held to be salvage value of property taken; judgment entered on special finding thereof]; Froman v. Rous, 83 Ind. 94 (1882) [action for unpaid balance of note]; Wood v. Wack, 31 Ind. App. 252, 67 N.E. 562 (1903) [contract action]; Kirkpatrick v. McMillan, 49 N. M. 100, 157 P.2d 772 (1945) [contract action]; Phelps & Bigelow Windmill Co. v. Buchanan, 46 Kan. 314, 26 P. 708 (1891) [general verdict less than conceded value of mill]; Lowenburg v. Rosenthal, 18 Or. 178, 22 P. 601 (1889) [action for conversion of wood; offset allowed as matter of law].

46. Wayne v. New York Life Ins. Co., 132 F.2d 28 (8th Cir. 1942) [computation of premiums due plaintiff as matter of law]; see Shaffer v. Great American Indemnity Co., supra.

of this opinion of their respective consent to entry of judgment in the amounts awarded in the general verdicts. In the event that notification of such consent is so made in either case, the judgment therein will be so modified, and as modified, affirmed.

We enter such order in these two cases for the reason that although motions for new trials were made by appellees in the Matlock and Nollenberger cases on the ground of the alleged inadequacy of the general verdicts, those motions were denied at the time the district court granted their motions to increase damages. We are uncertain whether the court considered and rejected the grounds urged in the motions for new trials or whether the court failed to reach those motions on the theory that it need not do so in view of its disposition of the other motions. Notwithstanding our view that the court erred in increasing the general verdict in each of these cases on the basis of the special findings, we recognize that the motions for new trials raise different issues from those raised in the motions to increase the general verdict, and that appellees should have the opportunity to be heard thereon.

## APPENDIX A.

*AFR 55–19

1–4
Air Force Regulation No. 55–19
Department of the Air Force,
 Washington, *13 July 1956*
Operations
Control of Local Air Force
VFR Air Traffic

*Purpose: Safe and efficient local Air Force flight operations today depend, in part, upon the manner in which local aircraft is supervised and controlled. This regulation provides guidance for commanders, pilots, and air traffic control personnel for insuring maximum safety and efficiency in their local flying operations.*

1. Establishing and Defining Local Flying Areas. The commander having jurisdiction over local flying activities will:

a. Establish local flying area(s) within 100 miles of his base. He will locate the area(s), insofar as practicable, outside populous areas, control areas, and control zones to use the least congested airspace within the 100-mile limit. (When required, the commander of a major air command may authorize the extension of a local flying area beyond the 100-mile limit.)

b. Define each local flying area by indicating prominent landmarks and/or radio fixes. When necessary, he will issue appropriate NOTAMS announcing that extensive training is being conducted within given vertical limits and that pilots entering the area(s) must use extreme caution.

2. Operational Control and Supervision. The commander having jurisdiction over local flight operations will:

a. Segregate the various types of local VFR flying activities, such as instrument training, acrobatics, and maintenance test, by designating discrete areas for each type of activity.

b. Schedule local VFR flight operations in a manner which will minimize congestion and potential air collision hazards.

c. Assign specific altitudes that will provide at least 1000 feet vertical separation to aircraft operating in a designated instrument training area.

3. Control of Air Traffic Near Airfields. The commander, the pilot, and air traffic control personnel are responsible as follows:

a. The *commander* will establish procedures to provide controllers with adequate position reports (relative to geographical and/or radio fixes) prior to entry of aircraft into the control zone or traffic pattern. To minimize conflict with traffic on civil airways, at nearby airfields, and in local flying areas, VFR

* This regulation supersedes AFR 55–19, 23 February 1950.

arrival and departure routes may be established. At joint bases, the establishment of such procedures and routes will be coordinated with other appropriate agencies.

b. The *pilot* approaching for landing will normally make initial contact with the appropriate air traffic control agency at least 5 minutes flying time from the airport and give his position. In all cases, he will make contact prior to:

(1) Entering the control zone, or

(2) Entering the traffic pattern, if he is on a local flight within the control zone. He will operate his aircraft at reduced power and speed consistent with safe operation. *The pilot is responsible for avoiding collision with other aircraft during VFR weather conditions.*

c. Both the *pilot* and *air traffic control personnel* will restrict radio transmissions to a minimum, consistent with safe operations. *Radio discipline will be rigidly enforced.*

4. Use of Traffic Patterns:

a. The *commander of a major air command* will establish two traffic patterns—the overhead and the rectangular—for bases under his control. (These patterns will be established in accordance with the attached diagram.) [Diagram deleted.] He may specify that his pilots fly either or both traffic patterns. He may, however, authorize deviations from the traffic patterns when the mission or local conditions dictate.

b. The *pilot performing an overhead approach* will fly initial approach, crosswind and downwind legs, at 500 feet above the rectangular traffic pattern altitude. He will commence descent when turning onto the base leg. Normally, his overhead approach will conform to an elliptical shaped pattern. It will consist of a 3-to-5 mile initial approach followed by two 180° left turns and a roll-out on the final approach at a distance of not less than one-quarter of a mile from the end of the runway and 300 feet above the ground.

c. The *pilot performing a rectangular approach* will conform to the rectangular traffic pattern shown in the attached diagram.

d. *Air traffic control personnel* and the *pilot* are authorized to make maximum use of controlled straight-in approaches.

e. The *pilot landing at bases outside his command* will fly the traffic pattern specified by his own command. He will, during the initial radio contact for landing instructions, state the type of traffic pattern he intends to fly.

5. Control of Simulated Instrument Flight Rule (IFR) Approaches. The commander, the pilot, and air traffic control personnel are responsible as follows:

a. The *commander* will direct maximum use of outlying facilities in order to relieve air traffic congestion near local navigational facilities.

b. The *pilot,* prior to conducting simulated IFR approaches, will inform the control tower of his intentions and obtain a clearance. He will monitor the appropriate control frequency throughout and inform the control tower of discontinuance of this activity. At those locations without a control tower, but where there is a communications station, he will contact this facility, state his intentions, request traffic information, and monitor an appropriate frequency. He will inform the communications facility of discontinuance of his activity.

1. *Air Force Traffic Control Personnel who ar authorized* to provide IFR control service will, in addition to application of VFR procedure and, insofar as practicable, furnish pilots practicing instrument approaches with IFR separation from other known traffic. Pilots provided with this service will be advised to maintain VFR flight. Altitude priority will be given to IFR flights. IFR traffic will not be delayed because of VFR traffic simulating IFR flight. When necessary, such VFR traffic may be suspended.

d. *Air Force Air Traffic Control Personnel who are not authorized* to provide

IFR control service will furnish traffic information to those pilots practicing instrument approaches and advise them to maintain VFR flight.

6. Issuing Local Directives:

a. The *commander of each Air Force base* will publish local directives to carry out the provision of this regulation. He will develop these directives in coordination with the local air traffic control agency (AACS, CAA, or other), adjacent military installation commanders, airport operators, and other interested agencies.

b. The *commander of each Air Force flying unit stationed on other than an Air Force base in a tenant status* will cooperate and collaborate with the airport operator, associated control agency, and other interested agencies in developing appropriate operational agreements concerning control of local VFR operations.

7. Disseminating Flight Information. The commander, air traffic control personnel, and base operations personnel are responsible as follows:

a. The *commander issuing directives or agreements* under the provisions of this regulation will furnish copies to adjacent military installation commanders, airport operators, associated control agencies, and other interested agencies. He will furnish information describing any special VFR arrival and departure routes established under paragraph 3a, to the Aeronautical Chart and Information Center for inclusion in the Remarks column, Directory of Aerodromes section, Radio Facility Charts.

b. The *commander responsible for administering annual instrument written examinations* for the Instrument Certificate (AF Form 8, white, and AF Form 8a, green) will direct the attention of each pilot to the provisions of this regulation at the time of examination.

c. *Air Traffic control personnel* will furnish pilots with traffic advisories and other information on local conditions, which will assist them in avoiding collisions during VFR weather conditions.

d. *Base operations personnel* will inform transient pilots of special departure procedures when flight plans are filed.

By Order of the Secretary of the Air Force:

N. F. TWINING
Chief of Staff,
United States Air Force

Official:

E. E. TORO
Colonel, USAF
Air Adjutant General

1 Attachment:
Standard Traffic Pattern Chart
DISTRIBUTION:
S

---

*AFR 55–19A
2–3

CHANGE

Air Force Regulation No. 55–19
Department of the Air Force,
Washington, 7 October 1957
Operations
Control of Local Air Force
VFR Air Traffic

AFR 55–19, 13 July 1956, is changed as follows:

2. Operational Control and Supervision. The Commander having jurisdiction over local flight operations will:

a. Segregate the various types of local VFR flying activities, such as instrument training, acrobatics, functional check flights, and flight tests, by designating separate areas for each type of activity. For this purpose the following definitions apply:

(1) *Functional Check Flight*—flying an aircraft to check the operation of the aircraft and its components as required in connection with inspection and maintenance operations.

* This change supersedes AFR 55–19A, 3 December 1956.

(2) *Flight Test*—flying an aircraft for the purpose of investigating or checking the operational characteristics of a new type of aircraft or component for which the airworthiness has not been determined by appropriate authority; or flight of production aircraft until the basic airworthiness of the aircraft and propulsion system is determined; or flights following major modification until the basic airworthiness of the aircraft has been determined.

\* \* \* \* \* \*

d. *In CONUS and Overseas:*

(1) *Within the Continental United States and its territories and possessions,* submit requirements for flight test areas to the major air command concerned. The major air command will submit those requirements that are approved to the Air Force member of the appropriate Regional Airspace Subcommittee. (AFR 55–103 lists addresses and areas of responsibility of Air Force Members of Regional Airspace Subcommittees.) Air Force members of Regional Airspace Subcommittees will in turn submit flight test area requirements to the appropriate CAA Regional Administrator for designation or approval.

(2) *In overseas areas,* submit requirements for flight test areas to the Major Air Command concerned. The Major Air Command will designate specific areas for conducting flight tests of aircraft over open water or sparsely populated areas having light air traffic. The major air command will coordinate with the appropriate authority having jurisdiction over the area within which the flight test operations will be conducted.

3. Control of Air Traffic Near Airfields. The commander, the pilot, and air traffic control personnel are responsible as follows:

a. The commander of an air base located in a congested area will establish VFR arrival and departure routes to minimize conflict with traffic on civil airways, at nearby airfields, and in local flying areas. When practicable, the commander of such a base should also establish higher VFR minimums within the local control zone. He will coordinate established procedures and routes with commanders of nearby airfields and other interested agencies.

b. The pilot approaching for landing will normally make initial contact with appropriate air traffic control agency at least 5 minutes flying time from the airport and give his position. In all cases, he will make contact prior to:

(1) Entering control zone, or

(2) Entering traffic pattern, if he is on local flight within the control zone.

c. Unless further restricted by special notices in radio facility charts, the pilot entering airport control zones, and when within 3,000 feet of ground, will operate his aircraft as follows:

(1) *Jet aircraft*—not to exceed normal traffic pattern entry airspeed.

(2) *Propeller-driven aircraft*—at reduced airspeed, but not to exceed 180 knots unless operational characteristics require greater airspeed. In such case, aircraft will be flown at minimum airspeed consistent with safety.

d. Both the pilot and air traffic control personnel will restrict radio transmissions to a minimum, consistent with safe operations.

\* \* \* \* \*

By Order of the Secretary of the Air Force:

THOMAS D. WHITE
Chief of Staff

Official:

J. L. TARR
Colonel, USAF
Air Adjutant General

DISTRIBUTION:

S